**UNITED STATES v. YELLOW CAB CO.**
**et al.**

**Civ. A. No. 46C1339.**

District Court, N. D. Illinois, E. D.

Nov. 15, 1946.

George B. Haddock and Melville C. Williams, Sp. Assts. to Atty. Gen., both of Chicago, Ill., for the Government.

Jesmer & Jesmer, of Chicago, Ill., for defendants Cab Sales & Parts Corp. and Checker Taxi Co.

Weymouth Kirkland, Howard Ellis, A. L. Hodson and John F. Floberg, all of Chicago, Ill., for defendants Yellow Cab Co., and Chicago Yellow Cab Co., Inc.

Kaufman Gallop Climenko Gould & Lynton, of New York City, and Winston, Strawn & Shaw, of Chicago, Ill., for defendants Checker Mfg. Corp. and Morris Markin.

Ringer, Reinwald & Sostrin, of Chicago, Ill., for defendant Parmelee Transp. Co.

LA BUY, District Judge.

This is an action by the government under Section 4 of the Sherman Act, 15 U. S.C.A. § 4, seeking relief against an alleged conspiracy and combination to restrain and to monopolize trade in violation of sections 1 and 2 of that Act. Defendants have filed motions to dismiss the complaint under Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, for failure to state a claim upon which relief can be granted.

The action is brought against six corporations and one individual. Checker Cab Manufacturing Corporation manufactures motor vehicles in Michigan for use as cabs. Its president is Morris Markin, a resident of Michigan. The Manufacturing Corporation and Markin will both be referred to hereinafter as "CCM". Chicago Yellow

Cab Company, Inc., owns all of the capital stock of Yellow Cab Company, which operates "Yellow" taxicabs in Chicago. Checker Taxi Company holds taxicab licenses issued by the City of Chicago and leases such licenses to Cab Sales and Parts Corporation which operates "Checker" taxicabs in Chicago. Yellow Cab Company, Checker Taxi Company and Cab Sales and Parts will hereinafter be referred to as "the taxicab operating companies." Parmelee Transportation Company operates vehicles in Chicago to transport passengers and their luggage from one railroad station to another pursuant to contracts with railroads and railroad terminal associations.

The complaint contains many allegations designed to show that CCM under contracts, understandings and stock acquisitions has such control of the taxicab operating companies and Parmelee that the latter are required to purchase their vehicles from CCM. No end is served by here summarizing these allegations. The court assumes for the purpose of the motion before it that CCM so controls the taxicab operating companies and Parmelee.

Although containing only one count the complaint actually charges two conspiracies. It charges, first, that the defendants have conspired to restrain commerce in the transportation by taxicabs of railroad passengers between, to and from railroad stations located in the City of Chicago. It charges, second, a conspiracy to restrain interstate trade in the sale of motor vehicles for use as cabs.

The scope of the first of these charges is all-important. The legality or illegality of any restraints alleged in the complaint must be tested solely by their effect on the transportation by taxicabs of railroad passengers coming to or leaving Chicago. The government does not claim that any such restraints affect the business of railroads or the transportation of railroad passengers except to the extent stated. The basic question on this charge is, therefore, whether the operating companies, to the extent that they transport by taxicabs interstate railroad passengers between, to and from railroad stations, are engaged in interstate commerce.

This is not the first time this issue has been presented to a court for determination. The United States Supreme Court in People of State of New York ex rel. Pennsylvania R. Co. v. Knight, 1904, 192 U.S. 21, 24 S.Ct. 202, 48 L.Ed. 325, held that identical taxicab services were not interstate commerce but an independent local service preliminary or subsequent to interstate transportation. The Supreme Court has frequently referred to that decision and in each instance has treated it as correct. Swift & Co. v. United States, 1905, 196 U.S. 375, 401, 25 S.Ct. 276, 49 L.Ed. 518; Stafford v. Wallace, 1922, 258 U.S. 495, 528, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. And, this court is of the opinion that the decision in the Knight case is predicated on sound legal principles.

The Knight case is not disposed of by the fact, as urged by the government, that the court might have based its decision on other grounds. Nor do the many decisions under acts such as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., and the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., relied on by the government, weaken its force. These acts extended federal control over a wide area of intrastate activity which affects interstate commerce. Here, however, the question is whether defendants' taxicab operations are interstate commerce. But even under these acts the one case involving taxicab operations held them to be intrastate. Ridley v. General Cab Co., CCH 6 Labor Cases, 61,374. Also, in the Knight case [258 U.S. 528, 24 S.Ct. 204] the court made the following statement: "As we have seen, the cab service is rendered wholly within the state, and has no contractual or necessary relation to interstate transportation. It is either preliminary or subsequent thereto. It is independently contracted for, and not necessarily connected therewith."

To prove interstate character, the government points to the fact that defendants' taxicabs render services to interstate railroad passengers. The mere rendering of local services to an interstate passenger cannot transform an intrastate business into an interstate enterprise. To so hold would obviously result in obliterating the historical and sound distinction between the

two types of commerce. The government urges as an important element the fact that railroad stations in Chicago are designed to facilitate the use of taxicabs for the convenience of the interstate railroad passengers. But many railroad stations are also designed to afford easy access to other local services for the convenience of passengers. Thus, in Chicago at least two of the largest stations are specially designed to provide its passengers with easy means of access to the elevated lines. A number of railroad depots also provide accommodations for private automobiles. Stations in other cities are especially designed to furnish railroad passengers with access to large hotels. Can it be logically urged that because of these arrangements for the convenience of the passengers, the elevated lines or such hotels are engaged in interstate commerce? As was stated in the Knight case: " * * * many things have more or less close relation to interstate commerce which are not properly to be regarded as a part of it. If the cab which carries the passengers from the hotel to the ferry landing is engaged in interstate transportation, why is not the porter who carries the traveler's trunk from his room to the carriage also so engaged? If the cab service is interstate transportation, are the drivers of the cabs and the dealers who supply hay and grain for horses also engaged in interstate commerce? And where will the limit be placed?"

The following facts either appear in the complaint, are of common knowledge, or have been admitted in briefs and arguments. A railroad passenger upon his arrival in Chicago may freely choose one of several methods of local transportation whether he be going to another station or to any other point in the city. Such passenger, prior to his arrival, makes no arrangement with any railroad or with any one else for the hire of a taxicab in Chicago. If, upon arrival, he determines to take a taxicab he makes arrangements for carriage with the taxicab driver and is transported to another point in Chicago or its vicinity. The defendants' taxicabs do not cross state lines. The railroad passenger has control of the taxicab both as to contents, direction and time of use. He pays his taxicab fare to the taxicab driver at a rate fixed by the City of Chicago and the railroads have no control or interest in that fare. The carriage of a railroad passenger by any particular taxicab is casual and incidental and the number of taxicab trips in which interstate railroad passengers are transported is a small part of the total number of taxicab trips in Chicago. Finally, no corporate, contractual or other relationship in the nature of integration exists between the railroads and the taxicab companies.

No one of the foregoing elements, of course, is determinative. But as the Supreme Court has held, the determination of whether particular commerce is interstate or intrastate is a "practical" matter "drawn from the course of business". Swift & Co. v. United States, supra. Considering the entire course of business of the taxicab companies, the court concluded that such business, as held in the Knight case, is an independent local service preliminary or subsequent to any interstate transportation. In the court's judgment, therefore, the complaint fails to state a claim under the Sherman Act in so far as the transportation of interstate railroad passengers is concerned.

In addition the court is of the opinion that the complaint fails to set forth such facts as are necessary to show that the defendants conspired to or did restrain trade. The existence and legality of that restraint must be determined with respect to the transportation by taxicabs of interstate railroad passengers between, to and from railroad stations in Chicago. The complaint contains no allegations showing a conspiracy directed to, or in restraint of, that commerce. There is no allegation that defendants agreed upon the rates to be charged for the transportation of interstate railroad passengers. There is no allegation that insufficient taxicabs are furnished for the transportation of such railroad passengers. There is no allegation that defendants have otherwise restrained such commerce. The complaint instead proceeds on the theory that defendants conspired to restrain generally the business of furnishing cab services for hire in the City of

Chicago and leaves to assumption and inference the effect upon one small segment of that general business—the transportation of interstate railroad passengers. Such vital elements in the statement of a claim cannot be left to inference and speculation.

█ The complaint also alleges defendants have conspired to restrain and monopolize interstate trade in the sale of motor vehicles for use as cabs. The complaint proceeds on the theory that CCM has a monopoly of the sale of taxicabs in Chicago alone because the taxicab operating companies held about 80% of the taxicab licenses issued by the city. The complaint does mention three other cities, New York, Minneapolis and Pittsburgh. There patently exists no monopoly in the first two cities in which CCM subsidiaries operate 2,000 of the 13,000 and 125 of the 214 taxicabs respectively. The allegations with respect to conditions in Pittsburgh are too vague to determine the situation in that city. But the complaint does not charge that CCM has a monopoly in the manufacture of taxicabs or a monopoly in the general sense of the sale of taxicabs. It is a matter of common knowledge that the large automobile manufacturers produce and sell the great majority of vehicles used as taxicabs.

The State of Illinois has by statute delegated to the City of Chicago (Cities and Villages Act, Smith-Hurd Ill. Ann.Stats., Ch. 24, Secs. 23—28, 23—10, 23—27, 23—51, 23—78) power to regulate the taxicab industry in Chicago. The City of Chicago has in turn enacted a series of ordinances governing the licensing and operation of taxicabs in Chicago. Ordinances of September 25, 1929; May 18, 1934; December 22, 1937; June 26, 1945.

█ The court is of the opinion that the charge does not state a claim under these facts. Such restraint as exists in this case necessarily results from the acquisition by CCM of the control of two outlets for purchase of CCM's product. The nature of the restraint is that the outlets are thereby prevented from buying vehicles from manufacturers other than CCM or conversely that manufacturers other than CCM are prevented from selling vehicles to the outlets. Restraints of this nature are not frowned upon by the law. They are common and are inherent in the acquisition by a manufacturing company of outlets regardless of whether the manufacturer creates the outlets or acquires them by purchase or under exclusive agency arrangement. Exclusive dealing arrangements of this nature are normal, usual and customary business practices and their legality under the Sherman Act has long been recognized. United States v. Winslow, 1913, 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; United States v. United States Steel Corp., 1920, 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab and Transfer Co., 1928, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681, 57 A.L.R. 426; United States v. Paramount Pictures, Inc., D.C. 1946, 66 F.Supp. 323.

█ The effect of the restraint on interstate commerce is plainly inconsequential. It consists solely of sales of one product by one comparatively small manufacturer to two companies which have about 80% of one type of business in one city in the United States. It consists of sales of 2,500 taxicabs out of many thousands sold in interstate commerce. Such effect is clearly too unsubstantial to meet the test laid down for a violation of the Sherman Act. Apex Hosiery Co. v. Leader, 1939, 310 U.S. 469, 60 S.Ct. 982, 84 L. Ed. 1311, 128 A.L.R. 1044; United Mine Workers of America v. Coronado Coal Co., 1922, 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir. 1934, 72 F.2d 885.

The court, therefore, finds nothing illicit in the nature of the restraint resulting from CCM's acquisition of control of the taxicab operating companies.

█ The charge must fail, however, for a more decisive reason. If illegality attaches to CCM's acquisition of the taxicab operating companies such illegality must lie in the fact that the operating companies hold 80% of the licenses issued by the city. It is apparent from the relief

prayed in the complaint that this suit would not have been filed had CCM controlled only one operating company or had both operating companies held less than a majority of the licenses issued by the city. It is obviously indispensable to the theory of the complaint that the taxicab operating companies hold the great preponderance of licenses issued by the city. The government's theory therefore resolves itself into an attack on the validity of the city's taxicab ordinances or on the validity of the city's issuance of licenses to the taxicab operating companies.

The Sherman Act contains no authority for such an attack on the city's power or exercise of such power. The courts have uniformly held that the licensing and regulation of the taxicab industry is a subject for exercise solely by a municipality under its police power. This court and the courts of Illinois have held Chicago's taxicab ordinances a valid exercise by the city of its police power and they have held that the issuance by the city of a majority of the taxicab licenses to the defendant operating companies in this case does not create a monopoly. Capitol Taxicab Co. v. Cermak, D.C.1932, 60 F.2d 608; People ex rel. v. Thompson, 1930, 341 Ill. 166, 173 N. E. 137; City of Chicago v. Dorband, 1938, 297 Ill.App. 617, 18 N.E.2d 107; City of Chicago v. Eagle Taxi Co., 1933, 273 Ill. App. 614; Yellow Cab Co. v. City of Chicago, Circuit Court of Cook County, No. 46C 943, unreported, 1946. In Rudack v. Valentine (Spec.Term, N.Y. County, 1937), 163 Misc. 326, 295 N.Y.S. 976, aff'd, 1937, 274 N.Y. 615, 10 N.E.2d 577, the court held that the licensing and regulation of the taxicab industry is a valid exercise of a municipality's police power. The court pointed out that in substantially all cities the taxicab industry is treated as a public utility under local regulations.

It is not for the court to determine whether the city has acted wisely or unwisely in issuing the majority of its licenses to one interest or to two corporations owned or controlled by the same interest. It is a question rather for the determination of the city in the public interest of its citizens. The Sherman Act, as the Supreme Court has held, does not include within its reach such restraints as necessarily flow from the regulation of local problems by local governmental bodies. Parker v. Brown, 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315; Field v. Barber Asphalt Paving Co., 1904, 194 U.S. 618, 24 S.Ct. 784, 48 L.Ed. 1142.

With respect to Parmelee, the complaint makes two claims. First, it is alleged that Parmelee will not compete with the taxicab operating companies for the latter's business. This claim must refer to the taxicab companies' business other than the transportation of interstate railroad passengers. Since this remaining business is concededly intrastate business no basis exists for holding this claim within the reach of the Sherman Act. Second, it is alleged that the taxicab operating companies will not attempt to compete with Parmelee for contracts with railroads or railroad terminal associations for the transportation of railroad passengers and their luggage. Having in mind a commonly known fact that the taxicab business is totally different from Parmelee's both from a standpoint of equipment used and services rendered, the court is of the opinion the allegations referred to are insufficient to charge a conspiracy to restrain trade in this respect. Further, the court is unfamiliar with any principle of law that requires a corporation in an integrated enterprise to compete with an affiliated corporation.

For the reasons indicated defendants' motion to dismiss should be sustained.