## UNITED STATES *v.* YELLOW CAB CO. ET AL.

No. 1035. Argued May 7, 1947.—Decided June 23, 1947.

---

*Charles H. Weston* argued the cause for the United States. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Berge* and *Philip Marcus.*

*Samuel H. Kaufman* argued the cause for appellees. With him on the brief were *A. Leslie Hodson* and *Harold S. Lynton. Howard Ellis* and *Harold A. Smith* were on a motion to dismiss or affirm.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The United States filed a complaint in the federal district court below pursuant to § 4 of the Sherman Anti-Trust Act, 26 Stat. 209, as amended, to prevent and restrain the appellees from violating §§ 1 and 2 of the Act. The complaint alleged that the appellees have been and are engaged in a combination and conspiracy to restrain and to monopolize interstate trade and commerce (1) in the sale of motor vehicles for use as taxicabs to the principal cab operating companies in Chicago, Pittsburgh, New York City and Minneapolis, and (2) in the business of furnishing cab services for hire in Chicago and vicinity. The appellees moved to dismiss the complaint for failure to state a claim upon which relief might be granted. That motion was sustained. 69 F. Supp. 170. The case is now here on direct appeal by the United States.

The alleged facts, as set forth in the complaint, may be summarized briefly. In January, 1929, one Morris Markin and others commenced negotiations to merge the

more important cab operating companies in Chicago, New York and other cities. Markin was then president and general manager, as well as the controlling stockholder, of the Checker Cab Manufacturing Corporation (CCM). That company was engaged in the business of manufacturing taxicabs at its factory in Kalamazoo, Michigan, and shipping them to purchasers in various states.

Parmelee Transportation Company (Parmelee) was organized in April, 1929, with 62% of its stock being owned by CCM. It promptly took over the business of operating special unlicensed cabs to transport passengers and their luggage between railroad stations in Chicago, pursuant to contracts with railroads and railroad terminal associations. It then acquired a controlling interest in the Chicago Yellow Cab Company, Inc. (Chicago Yellow). This latter company holds all the capital stock of Yellow Cab Company (Yellow), the owner and operator of "Yellow" cabs in Chicago and vicinity. Yellow presently holds 53% of the taxicab licenses outstanding in Chicago. In addition, Parmelee acquired or organized subsidiary companies which now hold 100% of the taxicab licenses outstanding in Pittsburgh, 58% of those in Minneapolis, and 15% of those in New York City.[1]

In January, 1930, Cab Sales and Parts Corporation (Cab Sales) was incorporated. At all times, Markin has been the active manager of this company; since 1934, he

---

[1] Between October, 1929, and June, 1930, Parmelee acquired all the taxicab companies operating in Pittsburgh; it now operates the cabs through two wholly owned subsidiaries. Early in 1931, Parmelee formed a company to operate cabs in Minneapolis; a wholly owned subsidiary now operates 125 of the 214 cabs licensed in that city. Beginning early in 1929, Parmelee acquired certain companies operating cabs in New York City; it later consolidated them in a wholly owned subsidiary now holding 2,000 of the 13,000 licenses outstanding in that city.

has been the sole stockholder. It now owns and operates the "Checker" cabs in Chicago and vicinity, using licenses held in the name of Checker Taxi Company (Checker).[2] Checker presently has no employees and no property other than 1,000 Chicago taxicab licenses, or one-third of the total outstanding, which it leases to Cab Sales; nearly all of its stock is owned by associates of Markin.[3]

Markin also obtained a substantial interest in the DeLuxe Motor Cab Company, which was the third largest cab operating company in Chicago in 1929 with its 400 licenses. He caused all of its stock to be sold to Parmelee. It was then consolidated into a new company; in 1932, Cab Sales bought a controlling interest in this consolidated concern and caused it to suspend operations. Thus, by the end of 1932, Markin had gained control of the three largest taxicab companies operating in Chicago and, through Parmelee, had substantial footholds in the taxicab business in New York City, Pittsburgh and Minneapolis.

Yellow and Checker have consistently held a vast majority of the Chicago taxicab licenses. There were 5,289

---

[2] Checker originally was a cooperative company, the stockholders of which were the various owners of "Checker" cabs. In February, 1930, as part of a settlement of litigation between it and CCM, Checker agreed that its drivers would purchase all of their taxicabs from Cab Sales for a period of five years at $2,350 per cab. At the same time, CCM appointed Cab Sales as exclusive agent for these sales and agreed to sell its cabs to Cab Sales at $1,906 per cab. During the five-year life of this agreement, Checker drivers bought a large number of cabs from Cab Sales at prices about $400 above those at which Cab Sales bought them from CCM. As these drivers defaulted in their payments from time to time, Cab Sales would foreclose and take over the ownership and operation of the cabs. Since 1941, it has owned and operated all of these cabs.

[3] By 1932, Cab Sales had acquired over 97% of the stock of Checker. Markin caused this stock to be sold to certain of his associates in 1942.

licenses outstanding in January, 1929, of which Yellow held 2,335 (44%) and Checker 1,750 (33%). In September, 1929, the City of Chicago adopted an ordinance to the effect that no more licenses should be issued, except for renewals, unless it should be found that the public convenience and necessity required otherwise. The substance of this provision was repeated in an ordinance adopted in May, 1934. Yellow and Checker subsequently made agreements to reduce the number of cabs in operation and to induce the city to lower the number of licenses outstanding to 3,000, of which Yellow would hold 1,500 and Checker 1,000.

On December 22, 1937, the City of Chicago passed an ordinance providing for a method of voluntary surrender by licensees of a sufficient number of their licenses to reduce the number outstanding to 3,000. It was also provided that if the number of authorized licenses should later be increased above the 3,000 figure, such additional licenses should first be issued to the original licensees in proportion to, and up to, the number which they had surrendered. Yellow and Checker then made an agreement to implement this ordinance; Yellow agreed to surrender 571 licenses (leaving it with 1,595) and Checker agreed to surrender 500 (leaving it with 1,000); both parties promised to attempt to secure for Yellow 60% and for Checker 40% of any licenses in excess of 3,000 which the city might later issue. As a result, 3,000 licenses were left outstanding.

On January 16, 1946, the city authorized the issuance of 250 licenses to war veterans. Yellow was notified that 234 of its licenses, representing that number of cabs which had not been in operation, would be canceled. Checker was given a similar notice as to 87 licenses. Yellow and Checker then brought suit in an Illinois court to enjoin the city from issuing the new licenses and from canceling

any of the ones issued to them; they claimed that economic conditions prevented them from procuring taxicabs to replace those which had become inoperable. The Illinois courts held that the 1937 ordinance created a contract between the city and the licensees and that the city could not issue licenses to the war veterans without first replacing the licenses which Yellow and Checker had surrendered; it was further held that no monopoly existed, since the number of licenses and the rights of the licensees were subject to the control of the city. *Yellow Cab Co.* v. *City of Chicago*, 396 Ill. 388, 71 N. E. 2d 652.

Such is the nature of the facts set forth in the complaint. Those facts allegedly give rise to a combination and conspiracy on the part of the appellees (Yellow, Chicago Yellow, Parmelee, Cab Sales, Checker, CCM and Markin) in violation of the Sherman Act. The problems thereby raised can best be considered in relation to the purported terms of this combination and conspiracy. For present purposes, of course, we must assume, without deciding or implying, that the various facts and allegations in the complaint are true.

I.

It is said that the appellees have agreed to control the operation and purchase of taxicabs by the principal operating companies in Chicago, New York City, Pittsburgh and Minneapolis, insisting that they purchase their cabs exclusively from CCM. This excludes all other manufacturers of taxicabs from 86% of the Chicago market, 15% of the New York City market, 100% of the Pittsburgh market and 58% of the Minneapolis market. At the same time, the trade of the controlled cab companies is restrained since they are prevented from purchasing cabs from manufacturers other than CCM. The result allegedly is that these companies must pay more for cabs

than they would otherwise pay, their other expenditures are increased unnecessarily, and the public is charged high rates for the transportation services rendered.

The commerce which is asserted to be restrained in this manner has a character that is undeniably interstate. The various cab operating companies do business in Illinois, New York, Pennsylvania and Minnesota. By virtue of the conspiracy, they must purchase all of their cabs from CCM. Since CCM's factory is located in Michigan, interstate sales and shipments are inevitable if the conspiracy is to be effectuated. The conspiracy also prevents those operating companies from purchasing cabs from other manufacturers, thus precluding all interstate sales and shipments between each individual cab operating company and manufacturers (other than CCM) located in other states. Interstate trade, in short, is of the very essence of this aspect of the conspiracy.

But the amount of interstate trade thus affected by the conspiracy is immaterial in determining whether a violation of the Sherman Act has been charged in the complaint. Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, note 59, p. 225; *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 485. And § 2 of the Act makes it unlawful to conspire to monopolize "any part" of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy. The complaint in this case deals with interstate purchases of replacements of some 5,000 licensed taxicabs in four cities.[4] That is an appreciable

[4] 2,595 licenses in Chicago, 2,000 in New York City, 125 in Minneapolis, and an estimated 280 in Pittsburgh.

amount of commerce under any standard. See *Montague & Co.* v. *Lowry,* 193 U. S. 38.

Likewise irrelevant is the importance of the interstate commerce affected in relation to the entire amount of that type of commerce in the United States. The Sherman Act is concerned with more than the large, nation-wide obstacles in the channels of interstate trade. It is designed to sweep away all appreciable obstructions so that the statutory policy of free trade might be effectively achieved. As this Court stated in *Indiana Farmer's Guide Co.* v. *Prairie Farmer Co.,* 293 U. S. 268, 279, "The provisions of §§ 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce." It follows that the complaint in this case is not defective for failure to allege that CCM has a monopoly with reference to the total number of taxicabs manufactured and sold in the United States. Its relative position in the field of cab production has no necessary relation to the ability of the appellees to conspire to monopolize or restrain, in violation of the Act, an appreciable segment of interstate cab sales. An allegation that such a segment has been or may be monopolized or restrained is sufficient.

Nor can it be doubted that combinations and conspiracies of the type alleged in this case fall within the ban of the Sherman Act. By excluding all cab manufacturers other than CCM from that part of the market represented by the cab operating companies under their control, the appellees effectively limit the outlets through which cabs may be sold in interstate commerce. Limitations of that nature have been condemned time and again as violative of the Act. *Associated Press* v. *United States,* 326 U. S. 1, 18–19, and cases cited. In addition, by preventing the cab operating companies under their control from pur-

chasing cabs from manufacturers other than CCM, the appellees deny those companies the opportunity to purchase cabs in a free, competitive market.[5] The Sherman Act has never been thought to sanction such a conspiracy to restrain the free purchase of goods in interstate commerce. See *Montague & Co.* v. *Lowry, supra; Binderup* v. *Pathe Exchange,* 263 U. S. 291.

The fact that these restraints occur in a setting described by the appellees as a vertically integrated enterprise does not necessarily remove the ban of the Sherman Act. The test of illegality under the Act is the presence or absence of an unreasonable restraint on interstate commerce. Such a restraint may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent. Similarly, any affiliation or integration flowing from an illegal conspiracy cannot insulate the conspirators from the sanctions which Congress has imposed. The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act. That statute is aimed at substance rather than form. See *Appalachian Coals, Inc.* v. *United States,* 288 U. S. 344, 360–361, 376–377.

And so in this case, the common ownership and control of the various corporate appellees are impotent to liberate the alleged combination and conspiracy from the impact of the Act. The complaint charges that the restraint of interstate trade was not only effected by the combination of the appellees but was the primary object of the combination. The theory of the complaint, to borrow language from *United States* v. *Reading Co.,* 253 U. S. 26, 57, is that "dominating power" over the cab operating companies "was not obtained by normal expansion to meet

---

[5] To the extent that the controlled operating companies are charged higher than the open market prices, they are injured.

the demands of a business growing as a result of superior and enterprising management, but by deliberate, calculated purchase for control." If that theory is borne out in this case by the evidence, coupled with proof of an undue restraint of interstate trade, a plain violation of the Act has occurred. Cf. *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 189.

## II.

It is said that the appellees have agreed that Yellow and Cab Sales will not compete with Parmelee for contracts with railroads or railroad terminal associations to transport passengers and their luggage between railroad stations in Chicago. The complaint points out the well-known fact that Chicago is the terminus of a large number of railroads engaged in interstate passenger traffic and that a great majority of the persons making interstate railroad trips which carry them through Chicago must disembark from a train at one railroad station, travel from that station to another some two blocks to two miles distant, and board another train at the latter station. The railroads often contract with the passengers to supply between-station transportation in Chicago. Parmelee then contracts with the railroads and the railroad terminal associations to provide this transportation by special cabs carrying seven to ten passengers. Parmelee's contracts are exclusive in nature.

The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. *The Daniel*

*Ball,* 10 Wall. 557, 565. That portion must be viewed in its relation to the entire journey rather than in isolation. So viewed, it is an integral step in the interstate movement. See *Stafford* v. *Wallace,* 258 U. S. 495.

Any attempt to monopolize or to impose an undue restraint on such a constituent part of interstate commerce brings the Sherman Act into operation. Here there is an alleged conspiracy to bring nearly all the Chicago taxicab companies under common control and to eliminate competition among them relative to contracts for supplying transportation for this transfer in the midst of interstate journeys. Only Parmelee is free to attempt to procure such contracts; Yellow and Cab Sales are forbidden to compete for such contracts, despite the fact that they conceivably might provide the same transportation service at lower cost to the railroads.[6] The complaint accordingly states a violation of the Sherman Act in this respect. See *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211.

It is true, of course, that exclusive contracts for the transportation service in question are not illegal. *Donovan* v. *Pennsylvania Co.,* 199 U. S. 279. But a conspiracy to eliminate competition in obtaining those exclusive contracts is what is alleged in this case and it is a conspiracy of that type that runs afoul of the Sherman Act. Moreover, the fact that the competition restrained is that between affiliated corporations cannot serve to negative the statutory violation where, as here, the affiliation is assertedly one of the means of effectuating the illegal conspiracy not to compete.

---

[6] The District Court thought that Parmelee's equipment and services are so totally different from the taxicab business of Yellow and Cab Sales as to make competition for the contracts impractical and unlikely. But that is a matter for determination at the trial on the merits and does not negative the sufficiency of the complaint.

230

## III.

Finally, it is said that the appellees have conspired to control the principal taxicab operating companies in Chicago and to exclude others from engaging in the transportation of interstate travelers to and from Chicago railroad stations. To that end, they have conspired to induce the City of Chicago to limit the number of licensed taxicabs to 3,000, to hold 2,595 (or 86%) of these licenses themselves, to obtain for Yellow and Checker any licenses above 3,000 which the city might later issue, and to prevent new operators from entering the cab business in Chicago by having Yellow and Checker annually renew licenses for cabs which they do not operate and have no intention of operating.

The interstate commerce toward which this aspect of the conspiracy is directed is claimed to arise out of the following facts. Many persons are said to embark upon interstate journeys from their homes, offices and hotels in Chicago by using taxicabs to transport themselves and their luggage to railroad stations in Chicago. Conversely, in making journeys from other states to homes, offices and hotels in Chicago, many persons are said to complete such trips by using taxicabs to transport themselves and their luggage from railroad stations in Chicago to said homes, offices and hotels. Such transportation of persons and their luggage is intermingled with the admittedly local operations of the Chicago taxicabs. But it is that allegedly interstate part of the business upon which rests the validity of the complaint in this particular.

We hold, however, that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation

"between any two points within the corporate limits of the city." None of them serves only railroad passengers, all of them being required to serve "every person" within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental.

In a sense, of course, a traveler starts an interstate journey when he boards a conveyance near his home, office or hotel to travel to the railroad station, from which the journey is continued by train; and such a journey ends when he alights from a conveyance near the home, office or hotel which constitutes his ultimate destination. Indeed, the terminal points of an interstate journey may be traced even further to the moment when the traveler leaves or enters his room or office and descends or ascends the building by elevator.

But interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. *Swift & Co.* v. *United States,* 196 U. S. 375, 398; *North American Co.* v. *S. E. C.,* 327 U. S. 686, 705. And interstate journeys are to be measured by "the commonly accepted sense of the transportation concept." *United States* v. *Capital Transit Co.,* 325 U. S. 357, 363. Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey. We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations.

Here we believe that the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination.

What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used. It is contracted for independently of the railroad journey and may be utilized whenever the traveler so desires. From the standpoints of time and continuity, the taxicab trip may be quite distinct and separate from the interstate journey. To the taxicab driver, it is just another local fare.

*Pennsylvania R. Co.* v. *Knight,* 192 U. S. 21, demonstrates this common understanding. The Court there held that the Pennsylvania Railroad Company was subject to a state franchise tax by reason of the fact that it maintained a cab service within the boundaries of New York City for the sole benefit of its rail passengers. Its cabs transported the passengers between its ferry station and their residences and hotels. The Court stated that this cab service was an independent local service, preliminary or subsequent to any interstate transportation and not included in the contract of railroad carriage. Hence it was subject to state taxation. It is true that this ruling as to the extent of a state's taxing power is not conclusive as to the boundaries of interstate commerce for federal purposes. *Bacon* v. *Illinois,* 227 U. S. 504, 516; *Binderup* v. *Pathe Exchange, supra,* 311. But it does illustrate the normal and accepted concept of the outer limits of this type of interstate journey. And it is that concept that is determinative here.

We do not mean to establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of federal power or even beyond

the scope of the Sherman Act. In *Stafford* v. *Wallace, supra,* 528, the Court made plain that nothing in the *Knight* case was authority for the proposition that "if such an agency [local cab service] could be and were used in a conspiracy unduly and constantly to monopolize interstate passenger traffic, it might not be brought within federal restraint." Likewise, we are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken. A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress.

All that we hold here is that when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation. And a restraint on or monopoly of that general local service, without more, is not proscribed by the Sherman Act.

It follows that the complaint, insofar as it is based on such local taxicab service, fails to state a cause of action under the Sherman Act. It thus becomes unnecessary to discuss the points raised as to the substance of that part of the alleged conspiracy relating to this local service. Our conclusion in this respect, however, does not lead to an affirmance of the District Court's dismissal of the complaint. For the reasons set forth in Parts I and II of this opinion, the complaint does state a cause of action under the Act, entitling the United States to a trial on the merits. Since the portion of the complaint dealt with in Part III of this opinion is defective, appropriate steps should be taken to delete the charges in relation thereto.

With that understanding, we reverse the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE agree with Parts I and II of this opinion but dissent from the holding in Part III.

MR. JUSTICE BURTON concurs in Part III of this opinion. However, he believes that the complaint as a whole fails to state a cause of action and that, therefore, the judgment of the District Court dismissing it should be affirmed.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.