## EASTMAN et al. v. YELLOW CAB CO. et al.
### No. 9607.

United States Court of Appeals
Seventh Circuit.

March 11, 1949.

Rehearing Denied April 25, 1949.

Sanford Wolff, Richard Wolff and Mer-
wyn E. Cedar, all of Chicago, Ill. (Riskind

& Wolff, of Chicago, Ill., of counsel), for appellants.

Philip E. Ringer, M. Lester Reinwald, Morris Sostrin, Julius Jesmer (of Jesmer & Jesmer), Weymouth Kirkland, Howard Ellis and John M. O'Connor, Jr. (of Kirkland, Fleming, Green, Martin & Ellis), all of Chicago, Ill., for appellees Yellow Cab Co., Chicago Yellow Cab Co., Inc., Parmelee Transp. Co. and Checker Taxi Co.

Benjamin S. Adamowski, of Chicago, Ill. (Joseph F. Grossman, First Asst. Corporation Counsel, and L. Louis Karton, Head of Appeals and Review Division, Asst. Corporation Counsel, both of Chicago, Ill., of counsel), for appellees City of Chicago, Edward J. Gorman and John C. Prendergast.

Before KERNER and DUFFY, Circuit Judges and BRIGGLE, District Judge.

DUFFY, Circuit Judge.

This is an appeal from an order of the district court dismissing the complaint before trial. Nine defendants are named, but Yellow Cab Company, Checker Taxi Company, Parmelee Transportation Company, and the city of Chicago and two officials thereof are the principal defendants. The cab and transportation companies will be referred to as "Yellow," "Checker," and "Parmelee," respectively.

The complaint and amendments herein are unduly prolix, covering 41 pages of the printed record. However, referring to matters discussed on this appeal and rearranging them in chronological order, the allegations of the complaint may be summarized as follows: (1) That this action was instituted under Sec. 15 of the Sherman Act, 15 U.S.C.A.; in part under Amendment V, the United States Constitution; in part under Sec. I of the XIV Amendment of the United States Constitution; and also under the act entitled "Provisions Relating to Radio," Sec. 301, 48 Stat. 1081, June 19, 1934, 47 U.S.C.A. § 301; (2) that plaintiffs are owners and operators of taxicabs for hire on the streets of Chicago (the complaint sets forth at some length that plaintiffs are veterans of the armed forces of the United States and frequently refers to them as "plaintiff veterans"), and that Yellow and Checker combined with the city of Chicago to restrain and prohibit the plaintiffs from operating their vehicles, pursuant to a conspiracy to maintain a monopoly of the taxicab service in the hands of said defendant cab and transportation companies; (3) that the city of Chicago is the terminus of a large number of railroads; that it is necessary for a great majority of train passengers, including those traveling from one State to another, to get off the trains on which they travel to Chicago and go to another station, from two blocks to two miles distant, and there board other trains in order to complete their journeys; that a substantial number of such passengers in interstate commerce use taxicabs operated by defendants and plaintiffs in transporting themselves and their baggage from station to station; that because of the conspiracy of the defendants to restrain competition an acute shortage of taxicabs exists in Chicago which causes interstate passengers to miss train connections; (4) that taxicabs of the defendants operate largely in the downtown area of Chicago while taxicabs of plaintiffs, especially those equipped with two-way radios, operate throughout the city and in the outskirts of the city and on trips to the airports, and that the shortage of taxicabs existing interferes with interstate travel by plane; (5) that for periods from six months to two years plaintiffs have been rendering taxicab service to the public, and in an effort to provide better facilities and transportation, plaintiffs formed associations and invested large sums of money in garages, gasoline stations and two-way radio transmitting equipment, and thus were able to fairly compete with Yellow and Checker; that defendants conspired to interfere with and prevent the operation by plaintiffs of their two-way radio-equipped taxicabs by interfering with the formation of associations to which many plaintiffs belong and preventing the association name or the fact that the taxicab was radio-equipped from appearing by sign or insignia on such taxicabs, all resulting in an enormous loss of good will to plaintiffs, although taxicabs operated by defendant cab and transportation companies were permitted to and did continue to

carry advertising necessary to maintain their own good will; (6) that a conspiracy commenced in January, 1929; that prior to said date, ordinances of the city of Chicago did not limit or restrict the number of taxicab licenses which might be issued, but that in September, 1929, the city enacted an ordinance providing that no taxicab licenses should thereafter be issued unless the Public Vehicle License Commission should, after hearing, declare that public convenience and necessity required the issue of such licenses; that in January, 1929, Yellow held 2,335 or 44% and Checker 1,750 or 33% of the outstanding licenses.

The complaint then refers to the ordinances enacted by the city of Chicago on May 18, 1934, and on December 22, 1937. The first of these, a comprehensive ordinance to regulate the operation of taxicabs in the city of Chicago, provided among other things for the issuance of licenses for a term ending December 31, 1940. Based upon this ordinance 4,108 taxicab licenses were issued, Yellow receiving 2,166 and Checker, 1,500. The latter ordinance, passed on December 22, 1937, provided for a method of voluntary surrender of licenses to reduce the number outstanding to 3,000, and provided also that in the event the number of authorized licenses should later be increased above the 3,000 figure, said licenses should be issued to licensees ratably in proportion to the number voluntarily surrendered by such licensee. The ordinance further provided that authority to operate under the 1934 ordinance be extended to December 31, 1945, provided the licensee accepted the terms of the 1937 ordinance. Both Yellow and Checker did accept the terms, and Yellow surrendered 571 licenses (leaving it with 1,595) and Checker surrendered 500 (leaving it with 1,000).

On January 16, 1946, the City Council authorized the Public Vehicle License Commissioner to issue 250 permits for the operation of taxicabs, and provided that ex-service men were to be given preference and that the permits were to be issued only to individuals. On January 22, 1946, the Commissioner ordered Yellow to place in operation 234 of its licensed taxicabs which had not been operating, and Checker, 87 unoperated taxicabs, and directed that if this were not done within five days, the licenses for said cabs would be cancelled.

It is alleged that following March 18, 1946, 275 temporary one-year nontransferable licenses were issued to so-called "independents" with the consent of Yellow and Checker. In January, 1947, these temporary licenses were renewed for one year from their effective date. The complaint alleges further that 1,200 unlicensed taxicabs are being operated on the streets of Chicago and that the owners, including many of plaintiffs, are unable to obtain either regular or temporary taxicab licenses.

The complaint alleges that on February 5, 1947, the City Council found and declared that the demand for taxicab service in the city of Chicago was in excess of the 3,000 limit under the ordinance of December 22, 1937, and authorized Public Vehicle License Commissioner Gorman, one of the defendants herein, to issue sufficient additional licenses to bring the total to 5,500, under certain limitations and conditions however, which plaintiffs allege are discriminatory as to them and are a part of the conspiracy.

The complaint further alleges that the city of Chicago has arbitrarily ordered the plaintiffs and others like them to cease operation of their taxicabs on or before January 22, 1948, and that such order violates Sec. I of Amendment XIV, the Constitution of the United States.

The prayer of the complaint asks that the defendants be enjoined from interfering, hindering, or otherwise discouraging the plaintiffs and others like them from operating their taxicabs on the streets of the city of Chicago, and that such conspiracy in restraint of trade be adjudged unlawful, that the defendants be required to release and waive any rights they have under the ordinance of the city of Chicago dated December 22, 1937, and that licenses to operate their taxicabs be issued to the plaintiffs in like form as issued to drivers for defendant companies.

On February 13, 1948, the city of Chicago, and its officials listed as defendants herein, moved to dismiss the complaint for failure to state a claim upon which relief

can be granted; and on the 16th of February a similar motion was filed in behalf of the defendant cab and transportation companies. Thereafter, on March 4, the court permitted an amendment to the complaint, adding a number of additional parties plaintiff and one additional defendant. A second motion to dismiss by the defendant transportation companies was filed on March 9, 1948, on the same grounds as the first. Thereafter plaintiffs moved to amend their complaint so as to allege that an ordinance passed by the city of Chicago on February 6, 1948, was in furtherance of the conspiracy previously alleged in the complaint, in that it deprived them of the right to advertise on their cabs that they belonged to a certain association, and prohibited them from referring to certain of their cabs as being equipped with two-way radio, and that it discriminated against plaintiffs in other respects. The prayer of the amendment asked that the court declare the ordinance of February 6, 1948, null and void as being in violation of the Constitution of the United States, and more particularly of the Sherman Act, and it sought to enjoin defendants from interfering, arresting or otherwise discouraging plaintiffs and others like them from operating their taxicabs on the streets of Chicago.

Plaintiffs moved for a further amendment to the complaint to allege that Illinois Cab Drivers' Ass'n for Discharged Veterans, composed of 103 Negro veterans who are engaged in the operation of taxicabs in the city of Chicago, made application for licenses to defendant Gorman, as Commissioner of Licenses, but that not a single member of the association was granted a license even though he carried the requisite amount of insurance and possessed the necessary other qualifications; that, upon information and belief, the reason for the denial of such licenses was the fact that the drivers were Negroes, and that such denial was due to discrimination because of color prejudice, in violation of the XIV Amendment, the Constitution.

On March 9, 1948, the court heard the motions for amendment to the complaint and also the motion of plaintiffs for a temporary restraining order. The court granted leave to file the amendments to the complaint, and then entered the following order: "Further ordered, that said complaint and the amendments thereto be and they are hereby dismissed for lack of jurisdiction."

It will be noted that the amended complaint was dismissed on the court's own motion "for lack of jurisdiction." Rule 12(h), Federal Rules of Civil Procedure, 28 U.S.C.A. provides: " * * *. whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. * * *" Although three motions were pending to dismiss the complaint on the ground that it failed to state a claim upon which relief could be granted, the matter that was before the court at the time the order of dismissal was entered was a motion of the plaintiffs for a temporary restraining order.

The briefs filed by the parties on this appeal do not limit arguments to the question of jurisdiction as such, but discuss from a broader aspect the issue whether the complaint does state a claim upon which relief can be granted. Of course if an examination of the complaint reveals that the court lacks jurisdiction of the subject matter, it follows that no relief can be granted.

In arriving at its decision to dismiss, the trial court apparently relied upon determinations made by other courts in various lawsuits involving the ordinances described in the complaint, as well as on the decision of the United States Supreme Court in an anti-trust case, United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, commenced by the United States government against the same defendants named herein, except the city of Chicago and its officials.

The ordinance of September, 1929, which first created the Public Vehicle License Commission, and which provided that no taxicab licenses should be issued thereafter unless the commission found public convenience and necessity required such proposed service, was declared valid by a three-judge district court. Capitol Taxicab Co. v. Cermak, D. C., 60 F.2d 608.

The ordinances of May 18, 1934, and of December 22, 1937, as extended, were sustained by the Supreme Court of Illinois as a valid exercise of the city's police power. Yellow Cab Co. v. City of Chicago, et al., 396 Ill. 388, 71 N.E.2d 652. (The 1937 ordinance was due to expire on December 31, 1945, but was extended in June, 1945, for another five year period.) The suit was brought by Yellow and Checker against the city of Chicago, and the court held that the acceptance of the 1937 ordinance by Yellow and Checker constituted a contract, and that the city of Chicago was precluded from issuing taxicab licenses in excess of 3,000 without the consent of Yellow and Checker until it had first reissued to them licenses for those surrendered by them in 1938. The court also held that the ordinances did not create a monopoly in the taxicab business in the city of Chicago, but did point out that no taxi operator and no person who desired to enter the taxicab business had complained in that case about a monopoly.

In United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010, the complaint, which sought to prevent and restrain alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, was dismissed by the district court for failure to state a claim upon which relief might be granted (69 F.Supp. 170). The Supreme Court, dividing its decision into three parts, sustained in part and reversed in part the decision of the trial court. The court held in Parts I and II that the complaint did state a cause of action under the Sherman Act entitling the United States to a trial on the merits. Part I had to do with interstate purchases exclusively from one defendant of the replacements of some 5,000 taxicabs in four cities. Part II concerned the alleged existence of an agreement that Yellow and Cab Sales would not compete with Parmelee for contracts with railroads to transport passengers and their baggage between railroad stations in Chicago.

However, defendants herein rely strongly on Part III of that decision. In that case the complaint contained allegations similar to those contained in the complaint herein, as hereinbefore stated, and alleged a conspiracy to limit taxicab licenses in the city of Chicago, and the preventing of new operators from entering the cab business.

In order to understand just what the Supreme Court decided, it seems advisable to quote at some length from the opinion (332 U.S. 218, at page 230, 67 S.Ct. at page 1566, 91 L.Ed. 2010):

"The interstate commerce toward which this aspect of the conspiracy is directed is claimed to arise out of the following facts. Many persons are said to embark upon interstate journeys from their homes, offices and hotels in Chicago by using taxicabs to transport themselves and their luggage to railroad stations in Chicago. Conversely, in making journeys from other states to homes, offices and hotels in Chicago, many persons are said to complete such trips by using taxicabs to transport themselves and their luggage from railroad stations in Chicago to said homes, offices and hotels. Such transportation of persons and their luggage is intermingled with the admittedly local operations of the Chicago taxicabs. But it is that allegedly interstate part of the business upon which rests the validity of the complaint in this particular.

"We hold, however, that such transportation is too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act. These taxicabs, in transporting passengers and their luggage to and from Chicago railroad stations, admittedly cross no state lines; by ordinance, their service is confined to transportation 'between any two points within the corporate limits of the City.' None of them serves only railroad passengers, all of them being required to serve 'every person' within the limits of Chicago. They have no contractual or other arrangement with the interstate railroads. Nor are their fares paid or collected as part of the railroad fares. In short, their relationship to interstate transit is only casual and incidental."

If the Supreme Court had chosen to say no more, we would have no hesitation to adopt this ruling as applicable, and hold that the case at bar did not fall within the ambit of the Sherman Act and that the relief prayed for thereunder could not be granted; however, the court did say more,

for the opinion states, 332 U.S. at pages 232, 233, 67 S.Ct. at page 1568, 91 L.Ed. 2010:

"We do not mean to establish any absolute rule that local taxicab service to and from railroad stations is completely beyond the reach of federal power or even beyond the scope of the Sherman Act. In Stafford v. Wallace, supra, 258 U.S. [495] at page 528, 42 S.Ct. at page 406, 66 L.Ed. 735, 23 A.L.R. 229, the Court made plain that nothing in the Knight case [Pennsylvania R. Co. v. Knight, 192 U.S. 21, 24 S.Ct. 202, 48 L.Ed. 325] was authority for the proposition that 'if such an agency (local cab service) could be and were used in a conspiracy unduly and constantly to monopolize interstate passenger traffic, it might not be brought within federal restraint.' Likewise, we are not to be understood in this case as deciding that all conspiracies among local cab drivers are so unrelated to interstate commerce as to fall outside the federal ken. A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act or other federal laws resting on the commerce power of Congress.

"All that we hold here is that when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation. And a restraint on or monopoly of that general local service, without more, is not proscribed by the Sherman Act.

"It follows that the complaint, insofar as it is based on such local taxicab service, fails to state a cause of action under the Sherman Act. * * *"

For the purpose of testing the sufficiency of the complaint we must assume, without deciding, that the allegations thereof are true. We, therefore, must assume that in Chicago a shortage of taxicabs exists which burdens the journeys of interstate passengers, and that such burdens result from the alleged conspiracy. The Supreme Court says, United States v. Yellow Cab Co., supra, 332 U.S. at page 233, 67 S.Ct. at page 1568, 91 L.Ed. 2010: "* * * A conspiracy to burden or eliminate transportation of passengers to and from a railroad station where interstate journeys begin and end might have sufficient effect upon interstate commerce to justify the imposition of the Sherman Act. * * *" In that case the court's attention was focused on taxicab passengers whose journeys began or ended at a Chicago railway station, in contrast to the complaint in the case at bar wherein the interference with the interstate journeys of passengers merely traveling through Chicago is given the most emphasis. Although Parmelee operates with somewhat different type of motor vehicles, and has a contract with the railroads, it is difficult to discern any substantial difference in the status of an interstate passenger who uses a taxicab to travel from station to station, and the interstate passenger who uses Parmelee facilities. Yet the Supreme Court has squarely held that such Parmelee passengers are in interstate commerce. The court said, United States v. Yellow Cab Co., supra, 332 U.S. at page 228, 67 S.Ct. at page 1566, 91 L.Ed. 2010:

"The transportation of such passengers and their luggage between stations in Chicago is clearly a part of the stream of interstate commerce. When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character. * * *"

■ Construing the complaint in the light most favorable to plaintiffs, we hold that it does state a claim under the Sherman Act upon which relief can be granted. It is of course no valid objection that all of the relief asked for in the complaint and the amendments thereto cannot be granted.

■ Likewise it is not a sufficient objection for defendants to urge that the travel in taxicabs by interstate passengers between railroad stations in Chicago has only a slight effect on interstate commerce. Quoting again from United States v. Yel-

low Cab Co., supra, 332 U.S. at page 225, 67 S.Ct. at page 1564, 91 L.Ed. 2010,

"But the amount of interstate trade thus affected by the conspiracy is immaterial in determining whether a violation of the Sherman Act has been charged in the complaint. Section 1 of the Act outlaws unreasonable restraints on interstate commerce, regardless of the amount of the commerce affected. (Citing cases.) And § 2 of the Act makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy. * * * "

We now reach for consideration that part of the complaint which alleges a violation of plaintiffs' rights under the XIV Amendment. The portion of Section I of said amendment here applicable reads: " * * * nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Although plaintiffs make some argument that their claim arises under the due process clause, it is apparent that they mainly rely on the equal protection clause.

■ It must be conceded that the control and regulation of taxicabs used by the public is a valid exercise of the police powers of a city. The equal protection clause of the XIV Amendment permits a State, or a subdivision thereof, a wide discretion to classify in the adoption of police regulations. A classification which has a reasonable basis does not offend against that clause. To be condemned such classification must be clearly arbitrary and unreasonable. Bachtel v. Wilson, 204 U.S. 36, 41, 27 S.Ct. 243, 51 L.Ed. 357. The inequality prohibited is only such as is actually and palpably unreasonable and arbitrary. Frost v. Corporation Commission of Oklahoma, 278 U.S. 515, 522, 49 S.Ct. 235, 73 L.Ed. 483. He who asserts that a classification is arbitrary has the burden of proof that it does not rest upon any reasonable basis. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 79, 31 S.Ct. 337, 55 L.Ed. 369.

The original complaint charges that the city's order directing plaintiffs to cease operating their taxicabs on or before January 22, 1948, was arbitrary and discriminatory and violated Section I of Amendment XIV, in that its adoption and other actions of defendants resulted in a failure to provide a uniform method of evaluation of the applications for licenses, arbitrary refusal to grant permits to qualified applicants, and failure to grant to successful applicants licenses equivalent to those held by Yellow and Checker, and that by reason thereof the plaintiffs were damaged.

In the amended complaint the ordinance of February 6, 1948, is alleged to be in furtherance of the conspiracy described in the complaint, and adopted for the purpose of prohibiting competition between plaintiff taxicab operators and the defendant taxicab companies, and various alleged discriminations are set forth which plaintiffs allege are in violation of their rights under the XIV Amendment. Emphasis is laid on the provision of the ordinance requiring each plaintiff driver obtaining a license to operate his cab independently while Yellow and Checker are permitted to much more economically operate their vehicles with relief drivers, and on the fact that Yellow and Checker may use and advertise their association name but that this privilege is denied to the plaintiffs. There are other allegations of discrimination. Based on all of them the plaintiffs in effect portray the situation of strongly entrenched taxicab interests keeping their competition unorganized so that they will be able to retain their present dominant position, and specifically of defendant taxicab companies not fearing competition so long as they can prevent concerted and organized effort on the part of any other competing persons or groups, and that this very situation does exist, as alleged in the complaint, by reason of the conspiracy between Yellow and Checker and the city.

■ Defendant city of Chicago contends that the courts have held the ordinances of 1934 and 1937 to be contracts with Yellow and Checker and that the provisions contained in the licenses held by them were by reason thereof necessarily granted. However, in view of the city having extended

the expiration date of these ordinances on several occasions, we feel that even though the city be bound by contract with Yellow and Checker, that is no reason why the licenses which have been and are issued to others engaged in the same business should be limited by restrictions and conditions which are different and alleged to be discriminatory.

■ While the federal government does not have the right to regulate certain matters exclusively within the control of the State, it does have the right, by virtue of the XIV Amendment, to prevent any such regulation from being arbitrary and discriminatory. Power Manufacturing Co. v. Saunders, 274 U.S. 490, 47 S.Ct. 678, 71 L.Ed. 1165; Adams v. Tanner, 244 U.S. 590, 37 S.Ct. 662, 61 L.Ed. 1336, L.R.A. 1917F, 1163, Ann.Cas.1917D, 973; Glicker v. Michigan Liquor Control Commission, 6 Cir., 160 F.2d 96.

■ Again liberally construing the complaint in favor of the plaintiffs, we hold that it contains sufficient allegations which, if true, set forth a claim upon which relief can be granted under the equal protection clause of the XIV Amendment.

■ Only the amendment permitted on the day the order of dismissal was entered remains now for consideration. This amendment alleged that the Illinois Cab Drivers' Assn. for Discharged Veterans is an association composed of 103 Negro veterans; that members thereof made application for taxicab licenses to defendant Gorman, Commissioner of Licenses; that although they were interviewed they were thereafter notified to cease operating their cabs on the streets of Chicago (which cabs were then being operated without a license); that no member of the association was granted a license; that no reason was given for the failure to grant such licenses; that, upon information and belief, the only reason for the denial was the fact that such applicants were Negroes; that the city acted arbitrarily and maliciously, in violation of the rights of such applicants under the XIV Amendment. Although defendant Gorman is not alleged to have taken affirmative action in granting or rejecting the applications, the amendment asks

that his action be declared null and void, as violative of the Constitution of the United States.

The trial court might well have rejected this amendment. It does not allege that the members of the association are plaintiffs in this action (although it might be inferred that some of them are); it does not contain an allegation of a conspiracy or a monopoly; it makes no claim of any kind against defendants Yellow, Checker or Parmelee. It complains only of the inaction of defendant Gorman in not granting applications for licenses. There is nothing in the ordinances themselves which set up any discrimination based on color prejudice. We think that in its present form the amendment does not state a claim upon which these plaintiffs are entitled to relief.

The order of the trial court dated March 9, 1948, dismissing the complaint for lack of jurisdiction is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.