240 F.2d 831
 Ernest MATEO, Joseph Oku, Joseph K. Nakila, Joseph Acello, Wade H. Redmon, Harry L. Perry, Herman K. Kapule, Kenton Aichele, William T. Ahia, and James B. Jay, on behalf of themselves and on behalf of other employees of the defendants similarly situated, Appellants,
v.
AUTO RENTAL COMPANY, Ltd., and Thacker Transportation Co., Ltd., Appellees.
 No. 15227.
 United States Court of Appeals Ninth Circuit.
 January 23, 1957.
 
 Gill, Kokubun, Doi & Shim, Thomas P. Gill, Honolulu, Hawaii, for appellant.
 Ernest C. Moore, Jr., Honolulu, Hawaii (Moore, Torkildson & Rice, Honolulu, Hawaii, of counsel), for appellee.
 Stuart Rothman, Sol., Bessie Margolin, Asst. Sol., Sylvia S. Ellison, Atty., U. S. Dept. of Labor, Washington, D. C., Kenneth C. Robertson, Reg. Atty., U. S. Dept. of Labor, San Francisco, Cal., for James P. Mitchell, as amicus curiae.
 Before ORR, CHAMBERS and BARNES, Circuit Judges.
 BARNES, Circuit Judge.
 
 
 1
 This appeal raises primarily a question relating to the scope of coverage of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq. The District Court held that appellants were not employees "engaged in commerce" within the meaning of the Act. Accordingly, it denied recovery on appellants' alleged claim for overtime compensation and attorney's fees under Section 16(b) of the Act and dismissed the action.
 
 
 2
 Appellants were all employed by appellee, Auto Rental Inc., Ltd., during the period in controversy as drivers of so-called "airporter" vehicles in Honolulu, Hawaii. The airporter is an eleven passenger "stretchout" limousine, converted from a standard automobile chassis to provide accommodations for additional passengers. Appellants were engaged principally in transporting airline and steamship passengers to and from the Honolulu International Airport or the Port of Honolulu and the downtown and Waikiki districts. In addition, they occasionally drove the airporters on sightseeing tour trips. By far the major portion of appellants' work was the servicing of airline passengers. These passengers can be classified broadly into four general categories.
 
 
 3
 First, prepaid or pre-booked passengers. These persons had prearranged their local transportation prior to leaving their departure point. This group constituted approximately 30% of the incoming airline travellers and about 50% of Auto Rental's customers. A far smaller percentage prearranged transportation from Honolulu to the International Airport. Those who reserved space before arriving in Honolulu received coupons good for carriage. These coupons were redeemable for cash or exchangeable for tour trips. They were obtainable from travel agents or from various airlines such as Pan-American, United, and Northwest, which functioned as travel agents for this purpose. No contractual agreement existed between any of the airlines and Auto Rental to guarantee or encourage passenger use of the airporters.
 
 
 4
 Second, cash passengers. These were the casual or walk-in passengers, who rode the stretchouts without prearrangement, when space was available, in preference to other modes of local transportation. The majority of trans-ocean travellers were included in this group. They paid a fare of $1.50 each. This amount was fixed by the company, uncontrolled and uninfluenced by the airlines, upon the advice of local authorities.
 
 
 5
 Third, credit passengers. These persons were members of tour groups whose fare was charged to individual travel agents. Their transportation was not prearranged.
 
 
 6
 Fourth, crew members, of various airlines, also used the airporters. In respect to them, Auto Rental had executed contracts with several, but not all, airlines for their local transportation on a per car charge basis.
 
 
 7
 The only contractual agreements involving passengers were those negotiated between Auto Rental and Pan-American Airlines and United Airlines. These agreements applied only to deplaning passengers who had not made prior arrangements. The manifest purpose of these agreements, which were negotiated with local airline officials, was to avert the stranding of arriving passengers. In actual practice, there was little need for the agreements. Furthermore, the Hawaii Aeronautics Commission refused to recognize such agreements.
 
 
 8
 Our analysis of the applicable law must of necessity commence with the statutory language. We note initially that Congress has not legislated to the constitutional limits of the commerce power, but has instead restricted the purview of the Act to those "engaged in commerce."[1] It is not enough that the activity affect commerce; the employee must actually be engaged in interstate commerce. We therefore set aside considerations which govern the determination of those cases dealing with the broader "affect" concept. Neither do we regard as relevant those cases involving the "production of goods for commerce" provision. Of these three different phrases used in connection with the commerce power, the one with which we are concerned is the narrowest in scope.
 
 
 9
 In substance, appellants urge us to disregard the clear intent of Congress to thus limit the application of the statute. This we cannot do. It is not for us to extend where Congress has chosen to retract. Nor do we believe the rules applicable to shipment of merchandise are applicable to transportation of passengers.[2] Accordingly, we have no difficulty in differentiating the case of Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct 332, 87 L.Ed. 460.
 
 
 10
 The issue here presented is a factual one. Its determination must be guided by practical considerations, not technical conceptions. Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196. The ultimate test is whether the local transportation service is an "integral step in the interstate movement." United States v. Yellow Cab Co., 332 U.S. 218, 229, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010. Economic factors and common understanding are important considerations to be weighed in resolving this question. Such factors as the nature and extent of the work claimed to be part of interstate commerce, the structure and operations of the company, the competitive status of the firm, the relationship with those clearly engaged in interstate transportation, and the geographical location of the local termini are all relevant. The decision must rest on the particular facts of each case.
 
 
 11
 For this reason, other cases are of little assistance. However, in this area there are two situations, each more extreme than that at bar, which have come before the Supreme Court of the United States. Both situations were presented by the Yellow Cab case, supra. That decision, involving the scope of the Sherman Act [15 U.S.C.A. §§ 1-7, 15 note], held that local taxicabs which merely transport persons from railroad stations to homes and vice versa as part of their regular operations are not in interstate commerce, whereas the Parmelee system which operated shuttle service from railroad station-to-station in Chicago for transferring through passengers under exclusive contractual arrangements with railroad companies were engaged in interstate commerce. In the twilight zone between these polarized situations the Supreme Court has not had occasion to speak. It is in this area that the instant case falls. The task which confronts this court, as it so often does, is where to draw the line. Two other courts, the Fourth Circuit in Airlines Transportation, Inc., v. Tobin, 198 F.2d 249, and a district court in Cederblade v. Parmelee Transportation Co., D.C.N.D.Ill., 94 F.Supp. 965, affirmed on other questions, 7 Cir., 166 F.2d 554, have addressed themselves to somewhat similar factual situations as that at bar and have reached contrary results. The Tobin decision held that the employees were engaged in commerce; the Cederblade opinion held they were not.
 
 
 12
 We are not required to choose between these conflicting views since there are significant factual differences which serve to distinguish this matter from the Tobin case. It is true that the instant case is not as strong as Cederblade in one respect, (namely, no prearranged coupon system was there in operation); but it is equally true that Cederblade is weaker in another aspect, (that is, the buses there employed were used exclusively for airport transportation). The significant factual dissimilarities which differentiate the Tobin case are manifold. There Airlines Transportation contracted with three interstate airlines to provide transportation between the Raleigh-Durham Airport and points in these cities designated by the airlines. It was agreed that the limousines would be used exclusively in the services of the contracting airlines and that as many trips as would be necessary to provide convenient transportation for passengers would be made. Although it was provided in their contract that Airlines Transportation was to be an independent contractor, the airlines nevertheless exercised substantial control over its operations, reserving the right to schedule the arrival and departure of the vehicles, the type of vehicle used, and the uniform and discipline of the drivers. In addition, the charge for this service was fixed by the contracts. More than half the airline passengers used these limousines. The sole factor tending toward a finding of inclusion here present that was absent in the Tobin case is the prearrangement of local transportation. However, in that case, it was hardly necessary in light of the elaborate control over operations exercised by the airlines themselves.
 
 
 13
 In contrast to the closely knit relationship between the airlines and Airlines Transportation in the Tobin case, appellee Auto Rental had no such comprehensive contractual agreements with any airline; its contracts were limited in scope and unrecognized by public utility authority. While the agreements provided Airlines Transportation with a majority of the passengers, appellee Auto Rental, unfavored by special franchise, was engaged in a stiff competitive battle with other airporter systems and taxicab companies. In Tobin, the limousines were used exclusively for airport transportation; on the other hand, the airporters were used for a variety of purposes. Finally, there is no evidence in the record that the airlines exercised any control over the schedules, fares, or policies of the appellees. Of course, the dispatchers endeavored to coordinate airporters schedules with the early morning and early evening trans-ocean flights, but no definite time or stop schedule existed. Passengers were dropped at their individual destinations so long as that place was on or near the main route. Even local residents who were at the airport could obtain a ride in the airporters. In view of such conditions, we do not feel that the Tobin case should govern the instant matter.
 
 
 14
 However, the United States, as amicus curiae, argues vigorously that the decision of the Supreme Court in the second United States v. Capital Transit Co. case, 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93, undermines the rationale of the Cederblade decision and supports the Tobin case. We do not agree.
 
 
 15
 In the first Capital Transit Co. decision, 325 U.S. 357, 65 S.Ct. 1176, 89 L.Ed. 1663, the Supreme Court held that transportation by the Company of Washington D. C. residents from their home area to the downtown area where connections were available and waiting to take them to their ultimate work destinations in Government establishments in Virginia, one connecting line being owned and operated by Transit Co., was part of interstate commerce. In the interim period this connecting line was sold to independent interests. In the second case (a five to three decision), the Supreme Court viewed this change as insignificant, grounding its decision on the original intent to travel to Virginia, the transfer being only a temporary interruption in the continuous flow. Viewing the journey as an integrated unit, the conclusion was inevitable that the Washington portion was part of an interstate trip. The dissenters felt that the Court had gone beyond congressional intent and had entered the local transportation field. Be that as it may, it cannot be denied that the Capital Transit Co. cases involved a unique factual situation. The Company was the hub of a mass daily commuter service for thousands of workers. Conditions then existing in Washington combined to give the Transit Co. a virtual captive group of passengers. We do not feel that the decision involving such unique facts and another statute, the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., should be extended to this far different situation.
 
 
 16
 Moreover, it would seem that common understanding dictates the conclusion we reach. When a person arrives at International Airport; steps into the Honolulu sunshine; touches his feet to terra firma; receives a friendly aloha greeting; wires news of the safe arrival back to anxious relatives and friends; and is free to select from a multitude of choices a means of transportation to his local destination, he has, "in the commonly accepted sense of the transportation concept,"[3] arrived in Hawaii. Those who thereafter furnish him transportation are engaged in activity of a purely local nature. Extension of the Fair Labor Standards Act to cover drivers who provide this local transportation would transgress the intent of Congress.
 
 
 17
 Because of our conclusion that the action of the lower court in finding that the drivers are not engaged in commerce, as that term is used in the Fair Labor Standards Act, cannot be reversed, it becomes unnecessary to consider the Statute of Limitations' question; which was not pressed in oral argument. However, we can say that we fail to see any fatal ambiguity between subdivisions (a) and (b) of § 256.[4]
 
 
 18
 It seems to us that it was the definite intent of the Congress to have subsection (a) in the conjunctive, and subsection (b) in the disjunctive. It is a special rule, necessary in class action procedures to insure integrity thereof; and not to permit unauthorized litigation to exist. Burrell v. La Follette Coach Lines, D.C., 97 F.Supp. 279.
 
 
 19
 The ruling of the court, both on the question of the Statute of Limitations, and the factual determination of whether the appellants were engaged in commerce, are each correct, and are, affirmed.
 
 
 
 Notes:
 
 
 [1]
 Maneja v. Waialua Agricultural Co., 349 U.S. 254, 272, 75 S.Ct. 719, 99 L.Ed. 1040
 
 
 [2]
 United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010
 
 
 [3]
 United States v. Capital Transit Co., 325 U.S. 357, 363, 65 S.Ct. 1176, 1179, 89 L.Ed. 1663
 
 
 [4]
 29 U.S.C.A. § 256