**W. B. JACKSON**

v.

**AIRWAYS PARKING COMPANY, a**
**Georgia corporation.**

**Civ. A. No. 11413.**

United States District Court
N. D. Georgia,
Atlanta Division.

March 7, 1969.

Preston L. Holland, Hapeville, Ga., George & George, Forest Park, Ga., for plaintiff.

Arnall, Golden & Gregory (Cleburne E. Gregory, Jr.), Atlanta, Ga., for defendant.

## ORDER

EDENFIELD, District Judge.

This case comes to the court on a motion for summary judgment by the defendant, Airways Parking Company, and a countermotion for partial summary judgment by the plaintiff, Jackson, under the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C. § 201 et seq.

Plaintiff was employed by defendant from January 15, 1965 until February 2, 1967 as a parking attendant at defendant's lot. Defendant's lots are near or adjacent to the Atlanta Municipal Airport and are used by airline passengers who leave their cars there before plane flights, many of which are interstate.

The defendant operates the parking lot under an agreement of January 27, 1961 with the City of Atlanta for ten years under a percentage rental arrangement in which defendant was to pay the City a certain percentage of gross revenue in excess of a minimum rental. Four lots were used, three of which, designated "A", "B" and "C", were for general customer use, and the fourth of which, lot "E", was used for employees of the airport. Lots A and B were combined and were in front of the terminal building, while lot C was further from the main terminal and cheaper. Lot E was created by fencing off a portion of lot C and their respective capacities were occasionally changed by moving the fence separating the two lots. The employees who used lot E worked for more than 25 different employers who were located at the airport. Charges were made, according to defendant's undisputed contention, on a reduced monthly basis between the individual employees and defendant. No employers were involved. The defendant was required by the City to provide, on demand, 70 parking spaces for employees of the Federal Aviation Agency. The FAA, however, never requested any space. The City of Atlanta furnished 3400 free spaces to airline employees in another area not covered by the agreement between the City and defendant.

Plaintiff was a cashier at various exits in lots A and B where he collected fares from departing parkers. On several occasions—defendant states on three or four occasions for two or three days at a time—plaintiff also manned the booth at the employee lot, lot E.

Before working for defendant, plaintiff was employed for several months, beginning in October, 1964, with Airways Service, Incorporated, which had the same shareholders, officers, and management as the defendant. Under an August 18, 1960 agreement with the City of Atlanta, Airways Service operated a public valet parking service at the airport, also under a percentage rental arrangement. Customers drive their own cars to the entrance of the airport terminal building where they leave them and are given a ticket by the attendant, who then calls for a driver to place the car in a covered storage area. When customers want their cars, they present a ticket and pay the parking charges to the cashier in the booth. Among other things, plaintiff ticketed cars left with the valet service and wrote down the make of the car and tag number.

Neither defendant, Airways Parking, nor Airways Service, had any express contracts with the airlines and all of their business was done in the State of Georgia.

During his employment with the defendant, plaintiff asserts that he was not paid the minimum wage nor correctly compensated for overtime, within 29 U.S.C. §§ 206, 207. Plaintiff filed his initial complaint on December 8, 1967, for compensation during the period of his employment in accordance with the Fair Labor Standards Act, and also asked for an additional equal amount of liquidated damages plus attorney's fees, interest, and costs. On November 26, 1968, plaintiff filed an amended com-

plaint in which he alleged that his failure to receive the minimum wage under the Fair Labor Standards Act was due to a wilful violation of the Act by the defendant.

## I. ENGAGING IN COMMERCE

Plaintiff contends that he was "engaged in commerce" within the meaning of 29 U.S.C. §§ 206, 207, and was therefore subject to the benefits of coverage under the Fair Labor Standards Act (hereinafter referred to as the Act). He reasons that by virtue of his activities at the airport parking lot, he was a link in the stream of commerce. Defendant, on the other hand, argues that plaintiff's activities cannot be considered an engagement in commerce under the commonly understood requirements developed by the courts and the Administrator of the Act.

■ Before embarking on a discussion of this issue in the instant case, certain principles must be understood. First, an employee claiming the benefits of the wage and hour provisions of the Act on the ground of his engagement in commerce has the burden of proof on this point. In our case, plaintiff must sustain this burden by a preponderance of the evidence. Annot., 87 L.Ed. 87 (1943); Annot., 99 L.Ed. 1202 (1955); Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83 (1942). Second, an employee's engagement in commerce depends upon the nature of the employee's activities rather than the character of his employer's business. Annot., 87 L.Ed. 87, 89 (1943), and cases cited therein. Therefore, if his employees are found to be engaged in commerce, the employer cannot avoid his obligations under the Act on the ground that he is not "engaged in commerce". To the extent that his employees are engaged in commerce, so too is the employer. Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (1942); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943). However, while the employee's activities are crucial, the "relationship of an employer's business to commerce or to the production of goods for commerce may sometimes be an important indication of the character of the employee's work." 29 C.F.R. 776.2, and cases cited therein. However, the Act and the courts make no distinction as to the percentage, volume, or amount of activities of either the employee or employer which constitute engagement in commerce.

■ Third, the "commerce" in which plaintiff contends he is engaged is defined in § 203(b) of the Act to mean:

"* * * [T]rade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."

The term "commerce" is broadly defined and not limited to commercial transactions, trade, or commerce in goods. As the administrative regulations to the Act note,

"The inclusion of the term 'commerce' in the definition of the same term as used in the act implies that no special or limited meaning is intended; rather, that the scope of the term for purposes of the act is at least as broad as it would be under concepts of 'commerce' established without reference to this definition." 29 C.F.R. 776.8.

However, it is abundantly clear that Congress did not intend coverage under the Act to extend to the full extent permissible under the Commerce Clause to the United States Constitution. Regulation of hours and wages does not extend to the farthest reaches of federal authority. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943); 29 C.F.R. 776.1. It is not enough, given this stricture, that plaintiff in this case demonstrate that his employment activities merely "affect" commerce. 29 C.F.R. 776.9; *McLeod,* supra; Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656 (1943). The actual test employed by the courts in determining whether an employee, such

as the plaintiff here, is engaged in commerce has been variously stated. For example, some courts hold that the employee's activities must be in commerce itself, not just closely related to commerce, Wirtz v. B. B. Saxon Co., 365 F.2d 457 (5th Cir., 1966), while others note that the employee's activities must be an integral step in the interstate movement, Mateo v. Auto Rental Co., Ltd., 240 F.2d 831 (9th Cir., 1957). The test most frequently enunciated is that the employee's activities must be so closely related to interstate commerce as to be in practice and in legal relation a part of it. *McLeod,* supra; *Overstreet,* supra; Telephone Answering Service v. Goldberg, 290 F.2d 529 (1st Cir. 1961); 29 C.F.R. 776.9, and cases cited therein; Annot., 99 L.Ed. 1202 (1955). Yet, despite the fact that Congress did not exert its full constitutional authority in the Act, by requiring employees to be "engaged in commerce" rather than merely affecting commerce, the authorities are clear that this is "no reason for narrowly circumscribing the phrase 'engaged in commerce.'" *Overstreet,* supra, 318 U.S. at 128, 63 S.Ct. at 496. As the Supreme Court put it:

"It is clear that the purpose of the Act was to extend federal control in this field throughout the farthest reaches of the channels of interstate commerce." Walling v. Jacksonville Paper Co., supra, 317 U.S. at 567, 63 S.Ct. at 335, 83 Cong.Rec., 75th Cong., 3d Sess., Pt. 8, p. 9170.

These principles have proven more difficult in their application than in their simple restatement, however. The Administrator of the Act has gathered a number of cases together which have either included employees in coverage or denied them coverage. See, e. g., 29 C.F.R. 776.11. Counsel for both parties have cited most of the important cases in the area. Thus, courts have found the following employee activities to be outside the ambit of "engaged in commerce" and thus not covered under the Act: custodians and janitors, those providing sewage services, rodent control,

base housing, and record keeping, all at an airbase. Wirtz v. B. B. Saxon Co., supra; a cook employed by a company to prepare and serve meals to employees of an interstate railroad company, *McLeod,* supra, on which the Supreme Court split 5–4; taxicab drivers who transport airplane passengers to and from O'Hare Airport in Chicago, Evanston Cab Co. v. City of Chicago, 325 F.2d 907 (7th Cir., 1963) (antitrust case, however, not Fair Labor Standards); bus operators who drive between Chicago and the Municipal Airport, and truck drivers who transport trunks and baggage between residences, hotel, railroad stations and bus terminals, Cederblade v. Parmelee, 94 F.Supp. 965 (N.D.Ill., 1947); guards and watchman at an aviation corporation which trained student fliers for the United States Government, Phillips v. Graham Aviation Co., 157 F.2d 443 (5th Cir., 1946). See other cases cited in 29 C.F.R. 776.11. Instances in which employees have been considered "engaged in commerce" for purposes of this Act include fuel transporters, repair and maintenance men, and drivers in the motor pool, all for airplanes used in interstate transportation, *Wirtz,* supra; employees of a company which contracted with three interstate airlines to provide transit between an airport and those points in the surrounding cities designated by the airlines, Airlines Transport Inc. v. Tobin, 198 F.2d 249 (4th Cir., 1952); employees who operate a transport service between interstate depots and terminals, *Cederblade,* supra; operators and maintenance men for an interstate toll road and drawbridge over a navigable waterway. *Overstreet,* supra; switchboard operators employed by an answering service to answer calls for interstate airline carriers and handle cables and overseas calls for various firms in interstate commerce, *Telephone Answering Service,* supra; a porter at a bus station and terminal, Mornford v. Andrews, 151 F.2d 511 (5th Cir., 1945), but see Skidmore v. John J. Casale, Inc., 160 F.2d 527 (2d Cir., 1947), cert. denied, 331 U.S. 812, 67 S.Ct. 1205, 91 L.Ed. 1832

(1947); bus drivers for Capital Transit who transported District of Columbia residents to a place in the District where they transferred to Virginia buses, some of which were also owned by Capital, for work in Virginia, United States v. Capital Transit Co., 338 U.S. 286, 70 S.Ct. 115, 94 L.Ed. 93 (1949) (Interstate Commerce Commission regulation case, however, not Fair Labor Standards); employees for a business supplying messenger service to industrial and commercial enterprises engaged in interstate commerce, Walling v. Allied Messenger Service, 47 F.Supp. 773 (S.D.N.Y., 1942). See, also, 29 C.F.R. 776.10–.11, for additional cases in which coverage has been extended under the "engaged in commerce" principle.

■ An analysis of these cases, many of which come to contrary results on similar facts, demonstrates clearly, as one commentator puts it, that the courts "cannot escape the duty of drawing lines." Annot., 99 L.Ed. 1202, 1205. Practical considerations must be determinative. Mitchell v. C. W. Vollmer Co., 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1955). Several practical factors give the court guidance in drawing the line in this case to include the plaintiff within the wage and hour provisions of the Act, as being "engaged in commerce". As the Ninth Circuit stated them, in part,

> "Economic factors and common understanding are important considerations to be weighed in resolving this question. Such factors as the nature and extent of the work claimed to be part of interstate commerce, the structure and operations of the company, the competitive status of the firm, the relationship with those clearly engaged in interstate transportation, and the geographical location of the local termini are all relevant." Mateo v. Auto Rental Co., Ltd., supra, 240 F.2d at 833.

In addition to these factors, several others should be considered. These include the extent to which admittedly interstate commerce would be impeded without the employee activity in question; the contribution the activity makes toward consummation of the interstate transaction or communication; the extent to which the employee activity enables instrumentalities of interstate commerce to effectively move commerce; the degree to which the activity is a part of a continuous stream of commerce; and the contractual and practical relationship between the activity and interstate commerce. 29 C.F.R. 776.9. These factors present questions of degree which help explain many of the seemingly conflicting decisions. In this case, a consideration of the factors mentioned leads us to conclude that plaintiff is "engaged in commerce".

■ First, the defendant's parking lot is closely related economically to the presence of the airport. The lot is almost totally—if not completely—dependent upon the existence of the airport for its revenue. While it may well be that non-passengers and non-airport employees use the parking lot, even they would hardly frequent the parking lot absent the presence of the interstate facility. In point of fact, due to the airport's isolation from downtown Atlanta the parking lot would undoubtedly not exist were it not for the airport. This economic dependence is an important factor in the overall calculus. Thus, in denying coverage in Mateo v. Auto Rental Co., Ltd., supra, the Court stressed the fact that the defendant's employees were not solely engaged with airport transit, while in Airlines Transport, Inc. v. Tobin, supra, which extended coverage, the Court noted the heavy economic dependence of the limousine service upon the interstate facility. In our case, as we have seen, there is more than a casual economic relationship between the Atlanta airport and plaintiff's activities. The parking lot and its employees are dependent for their profit and livelihood on the presence of the airport. The parking lot, unlike taxis which may service an airport, cannot— and does not—go elsewhere for busi-

ness. Moreover, the City of Atlanta has extended to defendant economic monopoly of the parking at the airport. Any airline passenger bringing his car to the parking lot must either park at the defendant's lot or at the lot of Airways Service—which is but the defendant under another name. Here, unlike *Mateo*, supra, there was no "stiff competition" between the defendant and others performing the same service. Here, unlike there, plaintiff, along with his fellow-workers and employees of Airways Service, was the only one providing parking services for users of the Atlanta airport.

Second, absent defendant's parking lot, and thus without plaintiff's activities, interstate commerce at the Atlanta airport would be severely impeded. Doubtless there are other ways to get to the Atlanta airport—such as being driven in limousines, taxis, or cars which would not park. However, it is equally clear that many interstate travelers or those meeting interstate travelers are dependent upon the parking lot in their use of the airport. There are simply no other parking lots in the vicinity. Therefore, the plaintiff's activities on behalf of the defendant bore more than a tangential relation to the consummation of an interstate flight. This is not the case of the cook in McLeod v. Threlkeld, supra, whose service of meals to interstate employees was remote to the interstate function involved. Here, the ultimate interstate transaction—the flight—is directly tied-in with the service provided by the plaintiff. It promotes and facilitates the interstate function of the entire airport and is an indispensable part of its proper operation. Walling v. Allied Messenger Service, supra. Third, the geographic proximity of the parking lot to the airport leads to a common-sense understanding of the intimate relationship between interstate travel and the parking lot. Fourth, as we shall discuss in detail later, the parking lot and the City which owns the airport are bound together in an intimate legal contract under which

the City and the airport manager maintain a good deal of control over the parking lot. By virtue of the agreement, the lot is more effectively brought into the stream of airport commerce. Fifth, on occasion the plaintiff was instructed to work at the employee lot used by many employees employed in interstate commerce. While he may never have worked as much as a minimum number of hours during any work week at the lot, as defendant contends, he nevertheless was compensated for this work. The volume of this work is not of prime importance. 29 C.F.R. 776.3. Therefore, for all of these reasons, the plaintiff's activities are "so closely related to interstate transportation as to be in practice and legal relation a part thereof." *McLeod*, supra, 319 U.S. at 495, 63 S.Ct. at 1250.

## II. RETAIL EXEMPTION

Defendant contends that even if the plaintiff was engaged in commerce, Airways Parking was exempt from the minimum wage and hour provisions of the Act by virtue of the retail exemption provision of 29 U.S.C. § 213(a) (2). This section provides that the wage and hour sections of the Act, §§ 206 and 207, shall not apply to

"(2) [A]ny employee employed by *any retail or service establishment* * * * if more than 50 per centum of such establishment's annual dollar volume of sales of goods or services is made within the State in which the establishment is located, and such establishment is not in an enterprise described in section 203(s) of this title or such establishment has an annual dollar volume of sales which is less than $250,000 (exclusive of excise taxes at the retail level which are separately stated). A 'retail or service establishment' shall mean an establishment 75 per centum of whose annual dollar volume of goods and services (or of both) is not for resale and is recognized as retail sales or services in the particular industry."

■■ It is well understood that the exemption is to be narrowly and strictly construed. The burden is on the employer, the defendant in this case, to show by a preponderance of the evidence that his employees are "unmistakably within the terms and spirit of the exemption." Mitchell v. Kroger Co., 150 F.Supp. 30 (W.D.Mo. 1957), reversed and remanded on other grounds, 248 F.2d 935 (8th Cir., 1957). The purpose of this provision was to exempt from coverage those purely local retail establishments, like the corner drug store or grocer, which might do an interstate business by virtue of their location near state lines. Annot., 3 L.Ed.2d 1912 (1959). Congress felt that retail concerns of this nature did not sufficiently influence the stream of interstate commerce to warrant imposing the wage and hour requirements on them. A. H. Phillips Inc., v. Walling, 324 U.S. 490, 497, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

■ Plaintiff contends that the parking lot in question lacks the necessary "retail concept" in that it competes with no other parking lot and is an integral part of the air transportation establishment. Defendant rests its argument for inclusion as a "retail or service establishment" on two regulations of the Administrator of the Act. While the Administrator's interpretations are not conclusive they are entitled to considerable weight and should not lightly be set aside. Acme Car and Truck Rentals, Inc. v. Hooper, 331 F.2d 442, 447 (5th Cir., 1964); Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). 29 C.F.R. 779.30 lists numerous establishments the Administrator considers as retail or service establishments for purposes of the retail exemption, among which are "public garages". Defendant then points to 29 C.F.R. 779.319 which states that the location of retail or service establishments whether in "an industrial plant, an office building, or a government park, etc. will make no difference in the application of the exemption and such an establishment will be exempt if it meets the tests of the exemption." He therefore concludes that since defendant's parking lot would be considered as a retail establishment, it does not change its designation by virtue of its location at the airport.

■ Retail for purposes of the retail exemption, must be taken in its common and ordinary parlance. Annot., 3 L.Ed.2d 815. Certainly, defendant sells its services directly to the consumer in contradistinction to the manner of sale by wholesale establishments. The regulations admonish us that to be considered within the exemption, an establishment must be open to the general public. As the regulations state, a business "will not be considered a retail or service establishment within the meaning of the Act if it is not ordinarily available to the general consuming public." 29 C.F.R. 779.319. Plaintiff argues that because of defendant's location it does not sell to the general consuming public but only to airport customers. It does not, he contends, serve the "everyday needs of the community in which it is located." 29 C.F.R. 779.318. This, we feel, is a distorted conception of the requirement. As the regulations make clear,

> "An establishment, however, does not have to be actually frequented by the general public in the sense that the public must actually visit it and make purchases of goods or services on the premises in order to be considered as available and open to the general public." 29 C.F.R. 779.319.

Therefore, it seems to us that since the parking lot is open and available to the general public without restriction, that whether the general public actually uses it because of its location is irrelevant. The location of an establishment, for this purpose cannot take a business out of the retail exemption or we would wreak havoc with the exemption itself.

However, 29 C.F.R. 779.317 states that airports lack a retail concept and therefore cannot qualify for the retail exemption. Therefore, the court must decide if the defendant's parking lot

is part of a more comprehensive establishment—an airport establishment. If so, under 29 C.F.R. 779.317, the retail exemption would be unavailable to the defendant. Thus, as one commentator puts it,

> "The importance to the retail or service establishment exemption of proof as to whether a particular business facility is an 'establishment' was pointed out * * * one challenging the employer's claim to the exemption may make the * * * assertion that a small facility which meets the exemption tests is actually a part of a larger 'establishment' which does not meet the tests." Annot., 3 L.Ed.2d 1912, 1913.

For purposes of the exemption, "establishment" must be used as it is normally used in business and in government. Mitchell v. Gammill, 245 F.2d 207 (5th Cir., 1957). One of the indicia of an establishment is a distinct physical place of business. Annot., 3 L.Ed.2d 1912, 1913; 29 C.F.R. 779.23, including cases and congressional history cited therein. Here, the airport parking lot might be considered a distinctive place of business from the airport itself, with separate entrances and exits. While the existence of a distinct physical place of business is not conclusive, Lewis v. Brandt Furniture, Inc., 277 F.Supp. 907 (W.D.La., 1967), it is an important consideration in determining the scope of the establishment in question. Thus, in Mitchell v. Bekins Van & Storage Co., 352 U.S. 1027, 77 S.Ct. 593, 1 L.Ed.2d 589 (1957), a group of five separate warehouses under common control and ownership were held by the Supreme Court in a per curiam opinion to be separate establishments, because of their separate physical status. The airport and parking lot do not employ common employees, as in Acme Car & Truck Rentals, Inc. v. Hooper, supra. Yet another factor to consider is functional unity of operation. Businesses must be closely related to be considered single establishments. In A. H. Phillips Inc. v. Walling, supra, the Supreme Court held

that a warehouse and central bookkeeping office for an interstate retail chain could not be considered part of a single establishment. See, also, Mitchell v. Miller Drugs, Inc., 255 F.2d 574 (1st Cir., 1958). But it is clear, as the Fifth Circuit pointed out in Acme Car & Truck Rentals, Inc. v. Hooper, supra, that merely because there are two separate corporate entities with separate taxes and records, the two entities can still be considered a single "establishment". In that case a single establishment was found when there was common ownership and control of the two corporations, as well as common officers, mutual use of business premises, and one set of hourly employees used by both corporations. It seems to the court that with these as guidelines, the facts in the record are sufficiently at issue to warrant a denial of summary judgment for both parties. The lease inserted into the record does establish some degree of functional unity, but the court feels that a trial is necessary to establish the extent to which the airport and the parking lot actually operate as a functional unit, as opposed to separate units with a common goal, as well as to determine if they constitute one distinct physical place of business. Testimony on the extent to which the City has a common hand in the functioning of the entire airport in addition to the parking lot is necessary for a judgment on this matter. The instant case presents a novel factual situation. A decision is of great potential import. Therefore, we feel that additional light must be shed on the relationship between the parking lot and the City as owner of the airport. At present the record is murky on this vital point. It would seem that a good deal of functional integration is necessary to find a single establishment here. However, we are also cognizant that the retail exemption is

> " * * * to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky,

Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).

For these reasons we feel summary judgment is inappropriate.

## III. ENTERPRISE DOCTRINE

 The retail exemption above can only apply to a retail or service establishment which is "not in an enterprise described in section 203(s) of this title." 29 U.S.C. § 213(a) (2). Therefore, we must decide if the airport and parking lot can be considered an "enterprise". If so, the retail exemption would not be available to the defendant and coverage under the statute would exist. It is useful to recognize at the outset that an "establishment" is by no means synonymous with an "enterprise". Hammonds v. J. W. Broom & Sons, 195 F.Supp. 504 (W.D.N.C.1961); 29 C.F.R. 779.23.

As defined in 29 U.S.C. § 203(r), an enterprise means

" * * * the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor."

29 U.S.C. § 203(s) states, in relevant part, that:

" 'Enterprise engaged in commerce or in the production of goods for commerce' means any of the following in the activities of which employees are so engaged, including employees handling, selling, or otherwise working on goods that have been moved in or produced for commerce by any person:

\* \* \* \* \* \*

"(3) any establishment of any such enterprise, except establishments and enterprises referred to in other paragraphs of this subsection, which has employees engaged in commerce or in the production of goods for commerce if the annual gross volume of sales of such enterprise is not less than $1,000,000."

 Two potential enterprises exist here. The first is an enterprise between the defendant and Airways Service, Incorporated. The second is an enterprise between the defendant and the airport. In order for there to be an enterprise in either case three conditions set out in the statute must be met: related activities must be performed; unified operation or common control must exist; and there must be a common business purpose.

It is clear that an enterprise may well exist between defendant and Airways Service under these conditions. The employees for each perform similar functions in facilitating the parking of cars at the airport. Consumers using defendant's lots park their own cars. Airways Service operates valet parking at the airport in which a passenger may have his car parked under a covered storage area by an Airways Service employee. Airways Service, like defendant, had an agreement with the City, in this case to operate the valet parking for the benefit of the passengers at the airport. Plaintiff worked for Airways Service for several months before joining defendant. The functions performed by each are complementary, each supplementing the other and serving the parking desires of the consumers.

Activities are considered "related activities" within § 203 when they are the same or similar. Senate Report No. 145, 87th Cong., 1st Sess., at 41, U.S.Code Cong. & Admin.News 1961, p. 1620; 29 C.F.R. 779.206. Certainly the activities of these two corporations are similar, if not precisely identical. Not only are the activities related but "common control" exists. Both companies have the same shareholders, officers, and management. Defendant himself admits their common control and unified operation in his brief. Defendant's brief at 19.

The requisite "common business purpose" seems to exist for an enterprise between defendant and Airways Service. The regulations state in this regard that:

" * * * [T]he term 'common business purpose' will encompass activities, whether performed by one person or by more than one person, or corporation, or other business organization, which are directed to the same business objective or to similar objectives in which the group has an interest." 29 C.F.R. 779.213.

■ It seems that both commonly owned companies have as their purpose parking the cars of those using the Atlanta Municipal Airport. Both are organized and function to this end. We have already held that the activities of the plaintiff are in interstate commerce. Those of the employees of Airways Service are not distinguishable on this record. In any case, having found plaintiff to be in interstate commerce, the effect of the enterprise doctrine is to extend protection of the Act to fellow employees of the enterprise. Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968). However, due to the paucity of facts as to the exact relationship between these two companies, we do not hold at this time that they constitute an enterprise. Summary judgments are not lightly granted and we would prefer to defer a ruling on this point until all the facts are considered at trial. Almost no attention is paid in either brief to the possibility of an enterprise between the two. In fact, plaintiff fails to mention it at all. This is too crucial a point for the court to decide on an issue opposing counsel spent so little time discussing.

■ We must also consider whether the airport run by the City and the airport parking lot owned by defendant are an enterprise. Again, there must be related activities, unified operation or common control and a common business purpose.

First, the activities of the defendant company were related activities to those of the airport. The Senate Report on the 1961 amendments adding the enterprise doctrine makes it clear that activities are related when they are the same or similar or "when they are auxiliary and service activities". S.Rep. No. 145, 87th Cong., 1st Sess., at 41 U.S.Code Cong. & Admin. News 1961, p. 1660; 29 C.F.R. 779.208. Auxiliary and service activities may take numerous forms, such as maintenance by a management corporation wholly owned by a bank, of space occupied by the bank. Wirtz v. First Natl. Bank & Trust Co., 365 F.2d 641 (10th Cir., 1966). The Administrator of the Act includes among his list of auxiliary activities "the operation of employee or customer parking lots". 29 C.F.R. 779.208. We agree that this should be considered a related activity and that this conclusion is controlling in the instant case. The parking service performed by the defendant was a crucial supplementary service for the proper functioning and operation of the Atlanta airport.

Second, the court also feels that there is a common business purpose, within the meaning of the statute. Defendant strongly urges that there can be no common "business" purpose between a profit-making corporation, Airways Parking, and a non-profit municipal corporation, the City, which owns the airport. Clearly, defendant is correct in stating that the non-profit activities of eleemosynary, religious or educational organizations are not performed for a "business" purpose and cannot be part of an enterprise. However, if we look beneath form to substance, we find the City is the common lessor of most, if not all, activities at the airport. The City is engaged in proprietary activities with a similar purpose to those of the defendant. The City is owner of the airport with the objective of facilitating the interstate flight of passengers, both to best serve the passengers and to run the facilities of the airport on the most profitable basis for the City. The City is not engaged in an eleemosy-

nary activity, but in a service function with similar objectives to defendant's. Each seeks to serve passengers, each seeks to avoid losses, each has a stake in the success of the airport, both its volume and efficiency.

Third, there must be unified operation or common control of the related activities performed for a common business purpose, in order for the enterprise doctrine to apply. We feel that this issue is not ripe for summary judgment.

The lease between the lessor-City and the lessee-defendant gives the City a good deal of control over the defendant's activities. For example, the City collects rent based, in part, on the defendant's gross revenue; the lessee may make no alterations in the premises without the lessor's consent and not until all specifications are approved by the lessor's Aviation Committee; prices charged by the lessee are subject to the approval of the lessor, although the approval will be given as long as prices do not exceed those customarily charged for similar facilities at other airports of comparable size; the lessee's employees must be uniformed; signs displayed on the premises and the location of intercommunication telephone service are subject to the approval of the lessor's airport manager; proceeds from public telephones shall be the lessor's property; if the lessee wishes to have food or drink dispensers on the premises, they can be provided only by the airport concessionaire with no proceeds for the lessee; the defendant must set aside certain parking for employees of the Federal Aviation Agency if the Agency so demands; defendant's procedures for the ticketing of cars and method of keeping books are subject to the lessor's approval. Interestingly, under a somewhat similar lease with Airways Service, Incorporated, ASI was considered to have only a limited and circumscribed use of its premises, amounting to a license, for purposes of the ad valorem tax. Henson v. Airways Service, Inc., 220 Ga. 44, 136 S.E.2d 747 (1964).

The terms "unified operation" and "common control" do not have a fixed legal or technical meaning. The Administrator of the Act states that the term "unified operation" means combining, uniting or organizing the performance of the related activities so that in effect a single business unit is developed. 29 C.F.R. 779.217. Such unification may be achieved through leases which have the effect of aligning or integrating the activities of the entities comprising the enterprise. 29 C.F.R. 779.218. A unified operation may exist where, as in the instant case, the activities are separately owned or controlled. 29 C.F.R. 779.220. "Common control" may exist even if the power of control is seldom exerted or is even relinquished by agreement. 29 C.F.R. 779.224. A determination in either case depends upon a consideration of all the facts. Yet, as with the degree of functional unity for purposes of the retail exemption, the record is murky on the relationship between the parking lot and the airport. We do not know how the contract has worked in practice, the degree to which other lessees are regulated at the airport and the extent to which the City actually manages the airport complex. We have only the cold words of a lease to guide us. The court should not decide a summary judgment question on such meager facts.

## IV. LIQUIDATED DAMAGES

Although plaintiff has asked for liquidated damages, the defendant urges that these are barred by the defendant's good faith in believing no coverage extended to plaintiff. The defendant urges that under the decisions of the courts and the Interpretative Bulletins of the Administrator, it had reasonable grounds for believing it was not in violation of the Act. 29 U.S.C. § 260 states in this regard that:

"In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, if the employer shows to the satisfaction of the court that the act or omission

giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216(b) of this title." [1]

 In showing its good faith in denying plaintiff the benefits of the Act, the burden of proof rests upon the employer, Airways Parking. Wright v. Carrigg, 275 F.2d 448 (5th Cir., 1960). While the court has discretion here, General Electric v. Porter, 208 F.2d 805 (9th Cir., 1954), cert. den., 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097 (1954); Reed v. Murphy, 232 F.2d 668 (5th Cir., 1956), cert. den., 352 U.S. 831, 77 S.Ct. 45, 1 L.Ed.2d 51 (1956), we are guided by several principles. First, an employer may show good faith by proving its conduct was influenced by some authoritative, administrative or judicial ruling or similar situation. Ferrer v. Waterman S.S. Corp., 84 F.Supp. 680 (D.P.R., 1949). The key administrative bulletin here, 29 C.F.R. 779, is reasonably capable of an interpretation favorable to the defendant. However, the employer in this case must do more than merely contend good faith. Some affirmative action by the employer to determine how the employee should be classified must be proven. Rankin v. Jonathan Logan, Inc., 98 F.Supp. 1 (D.N.J., 1951). Therefore, on the basis of a mere allegation of good faith reliance, summary judgment cannot be granted to defendant on this issue. It is a question of fact, Lassiter v. Guy F. Atkinson Co., 176 F.2d 984, 21 A.L.R.2d 1313 (9th Cir., 1949), which must be heard at trial.

## V. DEDUCTION OF COMPENSATION FOR BREAKS

The defendant urges that if it is liable to pay plaintiff, one hour be deducted from each day the plaintiff worked for the two 30-minute breaks during which time the plaintiff did not punch his time card out. The defendant states that these rest periods were long enough to enable him to use the off-duty time effectively for his own purposes and were therefore not compensable hours worked. Plaintiff, on the other hand, argues that there should be no reduction for rest periods since he took only short breaks which are generally regarded as hours worked. He also contends that the defendant must have considered these short breaks as work time since his salary was a fixed amount regardless of the number of breaks, and further states that no one recorded the number he took, thus making any reduction in time impossible.

Periods during which an employee, such as the plaintiff, is completely relieved from duty for a period long enough to use the time effectively for his own purposes are not considered hours worked for purposes of the Act. 29 C.F.R. 785.16. However, an employee cannot use the time "effectively for his own purposes" unless he is definitely told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour. Ibid. While the time necessary to enable an employee to use his rest time effectively for his own purposes depends upon the circumstances of each case, ibid, the Administrator has established certain guidelines generally followed by the courts. Rest periods of from five to 20 minutes have become common and since they are generally considered to promote the efficiency of the worker, must be considered by the employer as hours worked. 29 C.F.R. 785.18; Mitchell v. Greinetz, 235 F.2d 621, 61 A.L.R.2d 956 (10th Cir., 1956). Plaintiff contends that his breaks fell within this short time span and never exceeded 20 minutes. He also states that he was told to hurry back from his breaks and that much of the time was spent walking to and from

---

1. Of course, liquidated damages will not be given if it is found at trial that the retail exemption is applicable or the enterprise doctrine does not apply.

rest room facilities. Plaintiff contends that he ate his meals on the job. Ordinarily, breaks of 30 minutes or more for meals are considered bona fide meal periods and non-compensable, but coffee and snack breaks are considered compensable work periods. 29 C.F.R. 785.19. Moreover, long breaks, even if not for meals, may not be compensable. Darr v. Mutual Life Ins. Co., 169 F.2d 262, 265, n. 3 (2d Cir., 1948) cert. den. 335 U.S. 871, 69 S.Ct. 166, 93 L.Ed. 415 (1948). Rest periods may be compensable if they bear a relationship to employment time and are beneficial to the employer. *Mitchell, supra,* 235 F.2d at 624.

■ No summary judgment is justified on this issue because of the factual determinations necessary to a conclusion. The facts are in dispute over the length of the breaks, and the record does not conclusively show the instructions given by the employer to the plaintiff as to their duration and purpose. At trial, the duration, benefit to the employer, and extent to which these periods permitted the plaintiff to use the time effectively for his own purposes, can be brought out. These factors cannot be adjudged on summary judgment from the conflicting facts at hand.

## VI. STATUTE OF LIMITATIONS AND AMENDED COMPLAINT

Plaintiff's employment with defendant extended from January 15, 1965 to February 2, 1967. Plaintiff's original complaint was filed December 8, 1967. An amended complaint alleging wilful violation of the Act was subsequently filed on November 26, 1968.

Defendant contends that the two-year statute of limitations in 29 U.S.C. § 255, applicable to actions under the Act, bars any recovery for any period prior to December 8, 1965, two years prior to filing the action. Defendant argues that plaintiff's amended complaint cannot extend the period of limitations, despite amended § 255 which provides a three-year statute of limitations for wil-

ful violations of the Act. Defendant's argument is bottomed on the theory that the 1966 amendment to § 255 cannot significantly extend the period of suit with respect to causes of action already accrued. Moreover, the defendant argues that the plaintiff's amended complaint relates to a different cause of action from the original complaint and therefore does not relate back to the date of the initial allegation.

■ At the time of the 1966 amendment to § 255 extending the period of limitations for wilful violations, plaintiff's initial cause of action was not yet barred under the two-year statute of limitations. The 1966 amendment had an effective date of February 1, 1967, but the plaintiff was employed with the defendant past this date. Since the violation of the Act, if one is found, is of a continuing nature, his cause of action was still good. A number of cases uphold and recognize the validity of statutes enlarging the period of limitations as to existing causes of action, i. e., ones not barred by the original limitation period. See, e. g., Dixie Construction Co. v. Williams, 95 Ga.App. 767, 98 S.E.2d 582 (1957). Although a new statute of limitations cannot revive a cause of action already barred by a statute of limitations as it previously existed, no one has a vested right in the statute until it has run in his favor. Extending the period of limitations pertains to the remedy and not to the right, and thus the period of limitations may be extended and become applicable to existing causes of action. Annot., 79 A.L.R.2d 1080 (1961). However, an exception to this rule exists where the statute creating the substantive right makes the period of limitation a qualification of the right itself, not simply a limit on the remedy. See, e. g., Callahan v. Chesapeake & O. Ry. Co., 40 F.Supp. 353 (E.D.Ky., 1941); Snyder v. Yoder, 176 F.Supp. 617 (N.D. Ohio, 1959). In such a case the new and enlarged statute cannot be used even if the initial action was not barred by the then-existing cause of action. However, in the instant action, the applicable stat-

ute of limitations for the Fair Labor Standards action is 29 U.S.C. § 255, the Portal-to-Portal Pay Act, enacted in 1947, long after the Fair Labor Standards Act of 1938 which created the substantive rights involved. Therefore, plaintiff's amended complaint is not barred merely because the cause of action had already accrued, especially when the amendatory act to § 255 does not expressly provide otherwise. Annot., 79 A.L.R.2d 1080 (1961); Chisholm v. Cherokee-Seminole S.S. Corp., 36 F. Supp. 967 (S.D.N.Y., 1940).

We also hold that the amended complaint, which carries with it a three-year statute of limitations, should relate back to the date of filing the original complaint, December 8, 1967.

Defendant contends that the amended complaint sets out a new cause of action with a different measure of damages, proof, and period of liability, and therefore should bar any relation back. However, the most recent interpretations of Rule 15(c) of the Federal Rules of Civil Procedure refute this notion. Rule 15 (c) states that:

> "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Many decisions held that if the amended complaint presented a new cause of action, it could not relate back to the date of the original pleading for statute of limitation purposes. Commissioner of Internal Revenue v. Rieck, 104 F.2d 294 (3d Cir., 1939); Blair v. Durham, 134 F.2d 729 (6th Cir., 1943); Lorenzen v. United States, 52 F.2d 106 (8th Cir., 1931). It was stated that the tests

> " * * * to be applied when the question arises whether an amended complaint should be permitted are— would a judgment bar any further action on either, does the same measure of damages support both, is the same defense open in each, and is the same

measure of proof required?" Popovitch v. Kasperlik, 76 F.Supp. 233, 239 (W.D.Pa., 1947). See, also, United Exhibitors v. Twentieth Century Fox Film Corp., 18 F.R.D. 469 (W.D.Pa., (1956).

■ This, however, is not the best view of Rule 15(c). The point of Rule 15(c) is that it is fair to have an amended complaint relate back if the initial complaint put the defendant on notice that a certain range of matters was in controversy and the amended complaint falls within that range. The "cause of action" doctrine is an unduly restrictive interpretation of Rule 15(c). It does not do justice to the actual statutory language. Notice, not mechanical notions of cause of action for *res judicata* purposes, is the key. As the Fifth Circuit put it:

> "When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be, and that the form of the action or the relief prayed or the law relied on will not be confined to their first statement." Barthel v. Stamm, 145 F.2d 487, 491 (5th Cir., 1944), cert. den., 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1430 (1945).

■ Leading commentators now recognize that if the original pleading gives fair notice of the general fact situation out of which the claim arises, the defendant cannot be heard to complain of the amended complaint arising out of the same transaction. 3 Moore, ¶ 15.15[2]. Certainly fair notice was given in our case. The two complaints arise out of the identical factual situation and merely differ in the wilful allegation. Moreover, liquidated damages were requested in the initial complaint, thus alerting the defendant to a bad faith issue and possible wilful allegation. The Federal Rules broadened the concept of a "cause of action". An amendment which changes only the legal theory of the action or adds another claim arising

out of the same transaction will relate back. 3 Moore, ¶ 15.15 [3]. See Cavanagh v. T. W. A., 183 F.Supp. 370 (W.D. Pa.1960), where an amended complaint based on wilful and wanton negligence was allowed to relate back to one based on negligence. In our case the mere addition of an allegation of wilfulness will not prevent the amended complaint from relating back, despite certain changes introduced by the element of wilfulness. As Professor Moore puts it,

"Also rejected are various mechanical rules which sometimes have been used in applying Rule 15(c), such as whether evidence on the new claim could have been offered under the original pleadings, whether a judgment on the old or the new claim would bar the other and whether the same defense could be offered against both claims. Such rules are properly rejected, since they largely reflect attempts to limit relations back to the same 'cause of action', when the Rule has abandoned the concept in favor of the 'same transaction or occurrence' test." 3 Moore, ¶ 15.15[3], at 1038.

Therefore, the amended complaint shall relate back to the time of the initial complaint for purposes of computing the statute of limitations.

## VII. DOLLAR AMOUNT DUE

Defendant contends that if coverage is based on an enterprise between defendant and Airways Service, Incorporated, it does not extend until January 1, 1966, when the combined entities reached $1 million in gross revenues, as required by 29 U.S.C. § 203(s) (3). The Administrator of the Act has set out several methods of computing the annual volume of sales, which consists of its gross dollar volume of all sales during a 12-month period. 29 C.F.R. 779.268. Without at this time computing the precise date at which the $1 million figure was reached by the enterprise, recovery will be limited to that period during which an enterprise existed. If, however, an enterprise is found to exist between the defendant and the airport, then pre-sumably no problem of gross revenue will arise. Likewise, if the retail exemption is inapplicable under a finding that the parking lot and airport were a single establishment and ordinary Fair Labor Standards coverage is extended, no such § 203(s) (3) problem will arise.

## VIII. JURY TRIAL

The plaintiff did not demand a jury trial at the time of his initial complaint. His request was made after the defendant's answer to the amended complaint. Defendant contends that the wilful element introduced by plaintiff's amended complaint raises no new issues and that the other issues on which plaintiff seeks a jury trial were in the original complaint, as to which a jury trial was waived.

Rules 38(b), (d), state that:

"(b) Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. * * *.

"(d) The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5(d) constitutes a waiver by him of trial by jury."

If the amended complaint raises new legal issues, the plaintiff would have a right to demand a jury trial on the new issues raised, even if no general demand had been made for a jury trial in the initial complaint. The time within which the demand is to be made is computed from the time of service of the last pleading directed to the new issue. 5 Moore, ¶ 38.41. Of course, had a general and timely demand for jury trial been made by the plaintiff, no new demand would have been necessary even though the amendment raises new issues, "since the general demand embraces all issues in an action that are triable by a jury." 5 Moore, ¶ 38.41, at 326. But in our

situation, absent new legal issues in the amendment, the plaintiff has no right to demand a jury trial as a matter of right and over defendant's objections. The right to jury trial is not revived by filing supplementary complaints. Reeves v. Penn. R.R. Co., 9 F.R.D. 487 (D.Del., 1949).

■■■■ As to the issues raised in the initial complaint, no jury trial should be held. Rule 38(d). It is true that under Rule 39(b) the court may grant a jury trial in its discretion, despite a previous waiver. While a motion is necessary for the court to act under Rule 39(b), we will treat the plaintiff's discussion of the need for a jury trial as such a motion. The spirit of the Federal Rules compels us to be as lenient as possible in granting jury trials. Wright, Federal Courts, Ch. 10, § 93. The trial judge is given wide discretion in this regard. However, in this case we feel a jury trial is not warranted on those issues raised in the initial complaint. First, the factual issues involved are mixed questions of fact and law for the most part and thus not "readily susceptible of jury determination". 5 Moore, ¶ 39.09, at 717. Moreover, counsel for plaintiff merely states that he "discovered for the first time at the Pre-Trial Conference that no demand for jury trial had been filed." Plaintiff's brief, at 19–20. However, plaintiff did not heed the warning that:

> "Counsel desirous of obtaining relief from waiver should be careful to spell out the basis or bases of his motion for relief, since it is settled today that the mere statement of 'oversight' or 'inadvertence' does not suffice to invoke the discretion of the court." 5 Moore, ¶ 39.09, at 719.

Therefore, no jury trial shall be held on those issues raised in the initial pleading.

■■■■ Moreover, no trial by jury is necessary on the wilful element added by the amended complaint. Plaintiff's orig-inal complaint asked for liquidated damages. 29 U.S.C. § 260 permits an employer to interpose good faith as a defense to the liquidated damages claim of 29 U.S.C. § 216(b). To recover under § 216(b), the plaintiff would have to demonstrate bad faith on the employer's part. Any consideration of bad faith would analyze those very issues of fact which would be considered under § 216 (a) for wilfulness. Since no new issues are added, no jury trial is necessary.

## IX. CONCLUSION

In summary, we have held that:

—Plaintiff was engaged in commerce.

—There is a question of fact for the court at trial as to whether there is sufficient functional unity between the airport and the airport parking lot and distinct physical locations of the two combined to warrant considering the existence of an airport establishment, which would not be within the retail exemption.

—There is a question of fact for the court at trial as to whether an enterprise exists between the airport and the parking lot and between the defendant and Airways Service, Inc.

—The award of liquidated damages, depending on the lack of good faith of the employer-defendant, will be heard by the court at trial.

—The question of whether one hour should be deducted from the plaintiff's working time each day for breaks and rest periods is a question to be decided by the court at trial.

—The amended complaint relates back to the date of the filing of the original complaint.

—If coverage is found under the enterprise doctrine, correct methods of computing the $1 million in gross revenue, essential under § 203(s) (3), must be employed.

—No jury trial is necessary or proper on any of these issues.